**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

LEV PARNAS,
IGOR FRUMAN, and
ANDREY KUKUSHKIN,

          Defendants.

No.  S1 19 Cr. 725 (JPO)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**JOINT MOTION FOR RELIEF FROM GOVERNMENT'S**
**VIOLATION OF ATTORNEY-CLIENT PRIVILEGE,**
**DEFENDANT IGOR FRUMAN'S MOTION TO SEVER and**
**MISCELLANEOUS RELIEF**

CADWALADER, WICKERSHAM & TAFT LLP
Todd Blanche
Sara Bussiere
Timbre Shriver
200 Liberty Street
New York, NY 10281
Tel.:  (212) 504-6000
Fax:  (212) 504-6666
todd.blanche@cwt.com

*Attorneys for Igor Fruman*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.   JOINT MOTION TO DISMISS THE INDICTMENT BECAUSE OF RECKLESS
VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE ......................................................... 3

FACTUAL BACKGROUND ................................................................................................ 4

ARGUMENT ........................................................................................................................ 9

    A.   The ▮▮▮▮▮▮▮ Email Chain Is Protected by the Attorney-Client Privilege ............. 9

       1.   Defendants Did Not Waive Attorney-Client Privilege ............................... 10

    B.   Dismissal of the Indictment is the Appropriate Remedy ............................... 13

    C.   Suppression Is Required ........................................................................... 15

       1.   The Affiant Recklessly or Intentionally Included Privileged Information ............... 16

       2.   The Government Cannot Show That the Affidavit, Excluding the Privileged Material,
Establishes Probable Cause for the Warrants Issued ........................................ 18

       3.   The Exclusionary Rule Requires Suppression ............................................. 19

II.   SEVERANCE AND IMPROPER JOINDER ....................................................................... 20

BACKGROUND ....................................................................................................................... 21

    A.   Severance, Generally ............................................................................... 23

    B.   Severance of Defendants ......................................................................... 24

    C.   Improper Joinder of Count Seven ............................................................. 27

III.   MISCELLANEOUS RELIEF ...................................................................................... 29

CONCLUSION ........................................................................................................................ 29

## TABLE OF AUTHORITIES

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437 (S.D.N.Y.1995) .......... 9

*Baptiste v. Cushman & Wakefield, Inc.*, 2004 WL 330235 (S.D.N.Y. Feb. 20, 2004)................ 10

*Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103 (S.D.N.Y. 2005) ..... 11, 12

*Franks v. Delaware*, 438 U.S. 154 (1978) ....................................................................... 15, 16, 19

*In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001) .............................. 11

*In re Grand Jury Proceedings,* No. M–11–189 (LAP), 2001 WL 1167497 (S.D.N.Y. Oct.3, 2001) ................................................................................................................................... 10

*Morales v. Portuondo*, 154 F. Supp. 2d 706 (S.D.N.Y. 2001) ..................................................... 10

*NXIVM Corp. v. O'Hara*, 241 F.R.D. 109 (N.D.N.Y. 2007) .................................................. 11, 12

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991)................................................................... 15

*S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134 (S.D.N.Y. 2004) ................................... 9

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002) ................................................................................................................. 10, 11

*U.S. v. Barnes*, 2008 WL 239408 ................................................................................................ 24

*United States v. Cambindo-Valencia*, 609 F.2d 603 (2d Cir. 1979) ............................................ 24

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000)................................................................ 15

*United States v. Davis*, 2018 WL 4373998 (S.D.N.Y. 2018) ....................................................... 24

*United States v. DiScala*, 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018)........................................ 23

*United States v. Figueroa*, 618 F.2d 934, (2d Cir. 1980) ............................................................. 24

*United States v. Gordon*, 346 F.Supp.3d 999 (E.D. Mich. Sept. 12, 2018).......................... 15, 17

*United States v. Grant*, 2004 WL 1171258 (S.D.N.Y. May 25, 2004)........................................ 17

*United States v. Greenfield*, 2001 WL 1230538 (S.D.N.Y. Oct. 16, 2001)........................... 27, 28

*United States v. Guzman*, 1998 WL 61850 (S.D.N.Y. Feb. 13, 1998) ........................................ 15

*United States v. Kaplan*, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) .......................... 13, 17, 18

*United States v. Kouzmine*, 921 F. Supp. 1131 (S.D.N.Y. 1996) ........................................... 27, 28

*United States v. Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995) ................................................. 23, 27, 28

*United States v. Leon*, 468 U.S. 897 (1987)..................................................................................... 15

*United States v. Levin*, 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015)............................................ 17

*United States v. Menashe*, 741 F. Supp. 1135 (S.D.N.Y. 1990)............................................. 24, 25

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ..................................................... 16, 18

*United States v. Rajaratnam*, 753 F. Supp. 2d 299 (S.D.N.Y. 2010) ........................................... 28

*United States v. Rogiers*, 2018 WL 3471812 (S.D.N.Y. July 5, 2018) ....................................... 23

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991)...................................................... 9, 20

*United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027 (D. Nev. 2006)....................... 18

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) .................................................................. 23

*United States v. Vilar*, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........................................... 19

*United States v. Williams*, 656 F. App'x 751 (6th Cir. 2016)................................................. 16, 18

*United States v. Yaron*, 2011 WL 3279054 (S.D.N.Y. July 28, 2011) .................................. 27, 28

*Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)............................................................. 9, 20

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 2007 WL 1573913 (S.D.N.Y. May 24, 2007) .......................................................................................................................................... 10

*Wong Sun v. United States*, 371 U.S. 471 (1963) ....................................................................... 19

*Zafiro v. United States*, 506 U.S. 534 (1993).............................................................................. 23

**Other Authorities**

Allan Smith, *Key Things We Learned From Lev Parnas' Revealing MSNBC Interview*,
    https://www.nbcnews.com/politics/trump-impeachment-inquiry/key-things-we-learned-lev-
    parnas-revealing-msnbc-interview-n1116931 ......................................................................... 22

*Anderson Cooper 360: Part 1 of Anderson Cooper's Interview with Lev Parnas*, Jan. 17, 2020,
    https://www.msn.com/en-us/news/politics/part-2-of-anderson-coopers-interview-with-lev-
    parnas/vi-BBZ2pUa ............................................................................................................. 22

*Anderson Cooper 360: Part 2 of Anderson Cooper's Interview with Lev Parnas*, Jan. 17, 2020,
    https://www.cnn.com/videos/politics/2020/01/17/lev-parnas-ukraine-trump-yovanovitch-
    ac360-part-2-vpx.cnn ........................................................................................................... 22

Jonathan Stempel, *Guilty Plea Entered in U.S. Case Linked to Former Giuliani Associates*,
    REUTERS, Oct. 29, 2020, https://www.reuters.com/article/us-usa-trump-giuliani/guilty-plea-
    entered-in-u-s-case-linked-to-former-giuliani-associates-idUSKBN27E2B6 ......................... 22

Katelyn Polantz and Michael Warren, *Connected By Subpoenas: Giuliani and His Ukrainian
    Middleman Lev Parnas Face Increased Scrutiny*, CNN POLITICS, Oct. 1, 2019,
    https://www.cnn.com/2019/10/01/politics/giuliani-parnas-ukraine-subpoena/index.html....... 22

Rebecca Davis O'Brien, *Giuliani Associates Face New Federal Criminal Charges*, WSJ, Sept.
    17, 2020, https://www.wsj.com/articles/giuliani-associates-face-new-federal-criminal-charges-
    11600383496.......................................................................................................................... 22

The Times (@thetimes), TWITTER (Nov. 10, 2020, 11:41 AM),
    https://twitter.com/thetimes/status/1326203260076777472?s=20 .......................................... 26

William K. Rashbaum and Ben Protess, *Lev Parnas, Giuliani Associate, Faces New Fraud
    Charges*, N.Y. TIMES, Sept. 17, 2020, https://www.nytimes.com/2020/09/17/nyregion/lev-
    parnas-charged.html............................................................................................................... 22

**Rules**

Fed. R. Evid. 404(b)............................................................................................................... 25

Federal Criminal Rule of Criminal Procedure 8(b) ......................................................... 23, 28, 29

Federal Rule of Criminal Procedure 14 ........................................................................... 23, 26, 29

**PRELIMINARY STATEMENT**

This case is a stark example of the risks to the proper administration of justice when the United States government rushes an investigation to achieve a goal other than its stated mission to ensure fair and impartial administration of justice for all Americans.  On October 9, 2019, Mr. Fruman was arrested as he boarded an international flight after being charged in an indictment that alleged various violations of federal campaign finance laws.  At the detention hearing and in the days that followed, the narrative advanced by the government, and echoed by the media, was that because Mr. Fruman was flying internationally on a one-way ticket, he was a flight risk and likely did not intend to return to the United States.  That narrative is false, a fact now well-known to the government.  Mr. Fruman is a United States citizen who loves this country and who has lived here for decades raising a family and building a successful business.  The voluminous discovery produced in this case shows no evidence to the contrary.  The most that can be said is that, like many international travelers, Mr. Fruman often traveled on a one-way ticket for cost-savings when he did not have a confirmed return date.  Regrettably, that truth is lost in the false narrative that continues to permeate public perception, due, in no small part, to the government's own public statements.

In addition to falsely labeling Mr. Fruman as a flight risk in public proceedings, the original indictment falsely claimed in a footnote that Mr. Fruman engaged in deceptive practices such as intentionally misspelling his last name as "Furman." (Dkt. 1, at 8.)   Save for the removal of the offending footnote in the superseding indictment, the government has made no effort to correct the false "flight risk" narrative pushed in the weeks after Mr. Fruman's arrest.  Moreover, the original indictment baldly accused Mr. Fruman of being in cahoots with an unnamed "Ukrainian Government official" to improperly attempt to influence government leaders in the United States.

-1-

(Dkt. 1, at 5, 7–8.)   Again, the government actively promoted this narrative.  The day after Mr. Fruman's arrest, the United States Attorney for the Southern District of New York held a press conference during which he referenced a large chart with an arrow pointing from "Ukrainian Government Official" to Messrs. Fruman and Parnas.  The United States Attorney stated that the

> defendants broke the law to gain political influence while avoiding disclosure of who was actually making the donations and where the money was coming from.  They sought political influence not only to advance their own financial interests but to advance the political interests of at least one foreign official – a Ukrainian government official who sought the dismissal of the U.S. ambassador to Ukraine.

(Press Release, U.S. Dep't of Justice, U.S. Attorney's Office, Southern District of New York, Lev Parnas And Igor Fruman Charged With Conspiring To Violate Straw And Foreign Donor Bans (Oct. 10, 2019).)  Eleven months later and after countless hours spent investigating this claim (after it was made), the Superseding Indictment omitted any reference to any such individual—because he (or she) does not exist.  The evidence produced by the government shows nothing more than a businessman, Mr. Fruman, who donated money to causes and candidates he believed in.  Nonetheless, the narrative that Mr. Fruman is somehow part of a scheme orchestrated by the Ukrainian government—as opposed to a hardworking United States citizen who supported a President disfavored by many in the media—continues to this day.   Rather than affirmatively correcting the government's false narrative, the superseding indictment simply omits some of the falsity that accompanied the frenzy of the original charges.  While unfortunate, there is little Mr. Fruman can do to correct past misstatements made by the government in this case.

One grave error made by the government, however, requires correction and suppression.  As part of its rush to indict, the government knowingly used privileged communications among the defendants and their counsel to attempt to prove the "foreign donor scheme" alleged in both indictments.  Notwithstanding long-established policies and procedures in the Southern District

of New York for protecting the attorney-client privilege, no such protections were put in place in this case and the prosecution has recklessly ignored and failed to remedy their improper use of privileged communications.  For this reason the indictment must be dismissed.  While other remedies such as suppression and removal of any member of the prosecution team who has viewed the privileged communication is often appropriate, because the government repeatedly cited a privileged communication in search warrant applications, even after knowing full-well that the communication was protected by the attorney-client privilege, such remedies are inappropriate in this case.  For the reasons that follow, we respectfully submit that based on the government's knowing and illegal use of protected communications, the court should dismiss the indictment because the process is so tainted that other remedies fail to properly hold the government to account.  In addition, Mr. Fruman seeks severance from Mr. Parnas at trial, or, in the alternative, severance of Count Seven of the superseding indictment.  Finally, Mr. Fruman joins in all co-defendants' motions and reserves the right to file additional motions after the government produces additional discovery and in advance of trial.

## I.   JOINT MOTION TO DISMISS THE INDICTMENT BECAUSE OF RECKLESS VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE

The defendants jointly move, for the reasons stated below, for the dismissal of the indictment because of the gross violation of the attorney-client privilege and for any other relief the Court determines appropriate.

## FACTUAL BACKGROUND

In 2018, Lev Parnas, Igor Fruman, David Correia,[1] and Andrey Kukushkin (collectively, the "Defendants") formed a cannabis business (the "Cannabis Venture").[2]  As is typically the case when forming such a venture, the Defendants consulted with multiple attorneys and advisors to ensure they were in compliance with various laws and regulations. (Lefcourt Declaration, *U.S. v. Parnas*,  at 2–3, ¶¶ 8, 11–12; *United States v. Parnas, et al.*, S1 19 Cr. 725 (JPO).)[3]  One such advisor and potential stakeholder was ██████████ through his role at a business advisory company called ██████████.[4]  As an advisor, ██████████ had responsibility for the corporate financials of the Cannabis Venture; maintained a continuous and close working relationship with the defendants, particularly Mr. Kukushkin who would primarily operate the business once it was running; and had been assisting in the planning of the Cannabis Venture. (*See* Lefcourt Decl. at 2, ¶¶ 2–6.)

On or about September 16, 2018, Mr. Kukushkin copied ██████████ and ██████████ an attorney[5] working with the group, on a chain of email communications among Mr. Kukushkin, Mr. Correia, and two ██████████ attorneys, ██████████ and ██████████ (*See* Lefcourt Decl. at 2–3, ¶ 9–10; ██████████ (hereinafter, the "██████████ Email").) ██████████

---

[1] David Correia pled guilty to Counts Two and Seven of the Superseding Indictment on October 29, 2020, pursuant to a plea agreement with the government.

[2] The Cannabis Venture ██████████. *See* Email from Nicolas Roos, Assistant U.S. Attorney, to Faith Friedman and Gerald Lefcourt, Counsel for Mr. Kukushkin (Apr. 29, 2020, 13:37 EST).

[3] For convenience for the Court and the parties, Mr. Fruman refers to the Declaration filed by Mr. Lefcourt, attorney for Mr. Kukushkin for relevant factual citations.

[4] ██████████ and Mr. Kukushkin jointly operate ██████████. ██████████ manages ██████████ financial matters. *See* ██████████. ██████████ attorney described ██████████ as chief financial officer for ██████████ businesses.

[5] ██████████ is admitted to practice in both California and New York.

-4-



(*See* Lefcourt Decl. at 2, ¶ 8; ███████████████.) ██████████████████

███████████████████████████████████████

███████████████████████ In a later email, ████████████████

████████████████████████████████████████

███████████████████████.) Mr. Kukushkin copied ███████████ on both emails. (*Id.*; Lefcourt Decl. at

2–3, ¶¶ 8, 12.)

     Mr. Kukushkin, ███████████ and ███████████ were officers and directors of ████

██████████[6] and ████████████ served as the entity's general counsel. (*See* ████████████)

Upon information and belief, around the same time the ████████████ Email chain was

forwarded from Mr. Kukushkin to ███████████ and ████████████ there were ongoing

discussions that ████████████ would potentially be involved in the formation of the Cannabis

Venture.

     After the original indictment in this case was filed on October 9, 2019, counsel for Mr.

Kukushkin learned that the government sought a search warrant for Mr. Kukushkin's emails.

(*See* Lefcourt Decl. at 3. ¶ 14.) In response, counsel notified the government that the account

contained privileged communications and provided a list of email addresses for other attorneys

with whom Mr. Kukushkin enjoyed an attorney-client relationship.  (Lefcourt Decl. at 3–4, ¶¶

14–18.) As relevant here, email addresses were provided for ████████████ including the email

---

[6] ████████████ owns the facilities and land for Mr. Kukushkin's cannabis businesses. *See*
████████████. ████████████ is CFO. *See* ████████████.

address  listed on the ██████ Email.[7] (Lefcourt Decl. at 3, ¶12; ██████ Email.) In

early December, additional attorney names and email addresses were provided to the

government, including certain attorneys from ██████ (Lefcourt Decl. at 4, ¶ 16.)

　　In January 2020, the government advised counsel for Mr. Fruman, Mr. Correia and Mr.

Kukushkin that materials Mr. Parnas was seeking to turn over to Congress as part of the

impeachment proceedings could be privileged as it related to Defendants' legitimate cannabis

business. (Lefcourt Decl. at 4, ¶ 17.)  In court, Mr. Fruman, Mr. Correia, and Mr. Kukushkin

lodged objections to Mr. Parnas' application on that basis. (Lefcourt Decl. at 5, ¶ 19; Dkt. 80, 81,

85.)  In February 2020, Mr. Kukushkin notified the government in writing that the email quoted

in the indictment was covered by joint attorney-client privilege.  (Lefcourt Decl. at 5, ¶ 20.)[8]

The government's response seemingly indicated that it did not know or understand the players

involved.  (Lefcourt Decl. at 5, ¶ 20–22.) In particular, it would appear that the government had

not previously been aware that ██████ was an attorney who was working with Mr.

Kukushkin, ██████ and their entities[9] and had been advising the group on this new

venture. (*Id.*)

　　During this email exchange, Mr. Kukushkin's attorney questioned the government's use

of a "taint team" or "filter team" and the procedures in place to ensure that the government's trial

team did not receive or review privileged communications.  (*Id.*) The government stated, without

elaboration, that "a filter team was utilized to screen for potentially privileged communications

---

[7] After Mr. Kukushkin's arrest, ██████ assisted in preparing bail documents, and those documents—which were provided to the government—clearly identified ██████ as an attorney assisting with Mr. Kukushkin's representation.

[8] Mr. Lefcourt's Declaration makes reference to certain communications with the prosecutors assigned to this case.  If the Court seeks the underlying emails as opposed to just references in Mr. Lefcourt's Declaration, they can be provided.

[9] As previously discussed, Mr. Kukushkin, ██████ and ██████ were officers and directors of ██████ and ██████ served as the entity's general counsel. *See* ██████.

in the returns that were obtained pursuant to all the warrants in this case, including the warrants that were executed on email accounts pre-indictment" and asked for Defendants' basis for asserting attorney-client privilege. (*Id.*) In response, Mr. Kukushkin's attorney requested additional information about the taint team's procedures and also explained the basis for privilege.  (*Id.*) Notably, the email pointed out that the general privilege issue had been flagged "immediately upon learning that [Mr. Kukushkin's] emails had been seized," and "it was the government who on January 21, 2020, contacted us to advise that the filter team had identified certain correspondence that may fall within an attorney-client privilege jointly held by Mr. Kukushkin and his codefendants." (*Id.*) The government has to this point not answered additional questions asked by counsel regarding the taint team's procedures.

Meanwhile, in or about March 2020, Mr. ███████ attorney apparently spoke with the government and asserted attorney-client privilege with respect to the email chain.  (Lefcourt Decl. at 6, ¶ 23.) According to information provided to counsel, ███████ informed the government that the email was privileged. (*Id.*)  At the end of April 2020, the government reached out to all Defendants, stating that ███████

███████

███████

███████ (Lefcourt Decl. at 6, 24.)  In response, all Defendants maintained that the emails were privileged and no exception applied.  (*Id.*) ███████

███████ (Lefcourt Decl. at 7, ¶ 26. ) It too asserted privilege as to communications with the Defendants.  (Lefcourt Decl. at 7, ¶ 27.) It is our understanding that neither ███████ nor ███████ produced any portion of the email chain.

Undeterred, in or about May 2020, the government sought and obtained a search warrant for Mr. ███████ emails, quoting the privileged ███████ Email in the affidavit asserting probable cause. (Lefcourt Decl. at 6, ¶ 25.)  The government also used the ███████ Email as a basis for probable cause to obtain various other search warrants.[10]

Though the government used the privileged ███████ Email chain extensively to assemble its case, the Superseding Indictment returned without any mention of the ███████ Email. (Lefcourt Decl. at 7, ¶ 28; Superseding Indictment, *United States v. Parnas, et al.*, S1 19 Cr. 735 (JPO), Dkt. #120 [hereinafter, "Superseding Indictment"].) In October 2020, the government took the position—in response to Defendants' inquiry—that the email quoted in the original indictment and produced as ███████ is not privileged although the government does not know if it will use it at trial.  (*See* Lefcourt Decl. at 7, ¶ 29.)

To this point, the government appears to be taking the position that this email chain is not privileged because either privilege was broken or it falls under an exception. (*See* Lefcourt Decl. at 7, ¶ 30.) It refuses to identify, however, on what basis it asserts these claims. (*See Id.*)  The government's unfounded claims ring hollow.  There is no doubt that the email and all communications surrounding the email constitute attorney-client communications and as such the government should not have viewed the email and should not have used it repeatedly as a basis to assert probably cause to search various email accounts and similar devices.  The defendants, therefore, jointly request that the court suppress the ███████ Email chain as well as all documents seized and information obtained from those documents.

---

[10] *See* disputed warrants at ███████████████████████████████████████████████████████████████████████████████████████████████ ; Lefcourt Decl. at 4. The materials seized from the execution of these warrants is extensive.

## ARGUMENT

**A.    The** ███████ **Email Chain Is Protected by the Attorney-Client Privilege**

Attorney-client privilege protects both a client's disclosures to his or her attorney as well as advice rendered by the attorney to the client, thereby encouraging "full and frank communication between attorneys and their clients." *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 138 (S.D.N.Y. 2004). Intentional intrusion into the attorney-client relationship "warrants careful scrutiny." *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). To establish the privilege, the proponent must show that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. at 138 (*quoting Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 441 (S.D.N.Y. 1995). The proponent of the privilege carries the burden of proving each element. *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973).

The attorney-client privilege protects the entirety of the ███████ Email chain. *First*, the Defendants at all times during the communications maintained an attorney-client relationship with ███████ attorneys and, as discussed below, with ███████ at all times during the communications. *Second*, the communications involve requests for both legal advice and legal services. The email communications show that Defendants sought advice from attorneys ███████████████████

████████████████████.  Indeed, ████████████████████

████████████████  *Third*, Defendants and the attorneys were engaged in these discussions

████████████████████, without the presence of strangers and not for the

purpose of committing a crime or tort (as discussed in greater detail below).

### 1.    Defendants Did Not Waive Attorney-Client Privilege

Once established, confidential communications remain shielded by attorney-

client privilege and, thus, undiscoverable absent a waiver from the privilege holder. *Morales v.*

*Portuondo*, 154 F. Supp. 2d 706, 730 (S.D.N.Y. 2001).  "Such a waiver may be found where the

client voluntarily discloses the communications to another party, or the communications are

made in the known presence of a third party in whom the client could have no reasonable

expectation of confidentiality." *Id.* at 730; *see also Baptiste v. Cushman & Wakefield, Inc.*, 2004

WL 330235, at *2 (S.D.N.Y. Feb. 20, 2004) ("[t]he attorney-client privilege will be waived if the

holder of the privilege discloses or consents to disclosure of any significant part of the

communication to a third party or stranger to the attorney-client relationship"); *In re Grand Jury*

*Proceedings*, 2001 WL 1167497, at *7 (S.D.N.Y. Oct. 3, 2001) ("any voluntary disclosure of an

attorney-client communication to a third party for purposes inconsistent with maintaining

confidentiality waives the attorney-client privilege as to that disclosure").

Communications maintain privilege so long as they are not circulated beyond those

individuals with a need to know the information and who share responsibility for the subject

matter of the communication at issue.  *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, No.

06 Civ. 7785(PKC), 2007 WL 1573913, at *4 (S.D.N.Y. May 24, 2007) (internal quotations and

citation omitted).  Where a consultant maintains a close working relationship with a company

and performs a similar role to that of an employee, the court has concluded that the consultant

was the functional equivalent of an employee.  *Twentieth Century Fox Film Corp. v. Marvel*

*Enters., Inc.*, No. 01 Civ. 3016(AGS)(H.), 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002).

Thus, confidential communications made to the consultant for the purpose of obtaining or

providing legal advice are subject to the attorney-client privilege. *Id.*; *see also Exp.-Imp. Bank of*

*the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (stating that

"communications between a company's lawyers and its independent contractor merit protection

if, by virtue of assuming the functions and duties of [a] full-time employee, the contractor is a de

facto employee of the company"); *In re Copper Mkt. Antitrust Litigation*, 200 F.R.D. 213, 216

(S.D.N.Y. 2001) (concluding that attorney-client privilege was not waived by including the

client's PR firm on otherwise privileged emails because the PR firm was "essentially[ ]

incorporated into [the company's] staff to perform a corporate function that was necessary . . . at

the time").  One court set forth a three-party inquiry to determine whether to consider a

consultant the functional equivalent of an employee:

> [1] whether the consultant had primary responsibility for a key
> corporate job, [2] whether there was a continuous and close working
> relationship between the consultant and the company's principals on
> matters critical to the company's position in litigation, and
> [3] whether the consultant is likely to possess information possessed
> by no one else at the company[.]"

*Exp.-Imp. Bank of the U.S.*, 232 F.R.D. at 113 (internal quotation marks omitted).

However, in *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 139 (N.D.N.Y. 2007), the court

did not apply such a rigid test.  Instead, it concluded that sharing documents protected by

attorney-client privilege with a third party did not waive the privilege because the third party was

> not some mere or informal advisor, he [was] the quintessential
> insider of this business on every aspect confronting it. Any
> disclosure to [the third party] was consistent with maintaining
> secrecy and at the time the [privileged document] was shared with
> him it was not meant to get into the hands of an adversary. . . . All
> of this information was being shared with him for his benefit as well.
> Thus, the lack of title or being relegated to a volunteer status does

-11-



not in and of themselves offend the protection afforded the
documents nor create a waiver.

*Id.*

Attorney-client privilege was not waived when Defendants forwarded the ██████████

Email chain to ██████████ and ██████████ because both ██████████ and ██████████

were essential parties in the Cannabis Venture. Evidence produced in discovery makes plain that

Mr. Kukushkin works extensively with ██████████ on multiple cannabis business ventures,

and ██████████ has continuously provided legal advice to the Defendants in the course of

forming the Cannabis Venture. In fact, ██████████ dealt with the financial aspects[11] of Mr.

Kukushkin's other cannabis businesses and was advising the Defendants on the financial aspects

of their Cannabis Venture. Indeed, according to ██████████ attorney, ██████████ serves a

chief financial officer to ██████████ businesses. The Cannabis Venture was another of Mr.

██████████ businesses, or at least that was the intention. Applying the test articulated in *Exp.-*

*Imp. Bank of the U.S.*, (1) ██████████ had primary responsibility for the corporate financials of

the Cannabis Venture, (2) ██████████ had a continuous and close working relationship with

the defendants, particularly Mr. Kukushkin, who would primarily operate the business once it

was running, and (3) as the primary consultant on corporate financials, ██████████ was best

positioned to answer questions ██████████. *See* 232

F.R.D. at 113. Having engaged in multiple cannabis-related businesses in the past, ██████████

served as the ideal candidate to coordinate the Cannabis Venture's financials and make key

business decisions. Thus, ██████████ functioned in a similar capacity to that of the advisor in

*NXIVM Corp.*—he was a necessary insider and the lack of a formal title within the budding

business venture does not diminish his pivotal role within the company.

---

[11] *See supra* note 9. ██████████ is the CFO of ██████████ *Id.*

**B.      Dismissal of the Indictment is the Appropriate Remedy**

The Southern District of New York has long-established rigorous policies designed to guarantee "privilege, Fifth Amendment and Sixth Amendment concerns" that include filter teams.[12]  The policy is designed to prevent exactly what happened here—trial  teams improperly obtaining access to and use of potentially privileged material, thus tainting the trial team and their prosecution.  *See United States v. Kaplan*, No. 02 CR. 883 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003)  To be sure, the same Unit that is in charge of this prosecution recently assured a different federal judge in the Southern District of New York that its filter procedures would prevent the trial team from viewing potentially privileged materials.  "To be clear, under no circumstances will a potentially privileged document or a document potentially subject to the crime-fraud exception be provided to or described to the Investigative Team without the consent of the privilege holder or his/her counsel, or the court's approval."  *Cohen v. United States*, C.A. No. 18-mj-03161-KMW, Gov. Opp. to Cohn TRO, Dkt. 1, at 7 (S.D.N.Y. Apr. 13, 2018).   In that case, the seized materials were from an attorney's office.  Similar to the materials seized in this case, however, the government believed that the seized materials contained a "low volume of potentially privileged communications." *Id.* at 1.  In that case, the government properly recognized the importance of protecting privileged communications from the trial team's view, and described "rigorous protocols" whereby a filter team comprised of prosecutors not otherwise associated with the case itself would review the relevant materials and withhold communications that were potentially privileged.  *Id.*  The prosecution in this case should have followed the same procedure here.  They did not.

---

[12] *See* https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/-nys_discovery_policy.pdf.

The example above is probative when compared to what has happened in this case. Although the government has made repeated references to a filter team who purportedly reviewed potentially privileged material, it does not appear that the filter team complied with the government's own policies when it comes to protecting privileged material. Even more troublesome is the fact that the defense counsel repeatedly alerted the government to the fact that the communications the trial team was relying on were privileged communications and should not be used. The government—undeterred in its efforts to use the protected communication—continued to use the privileged material to seek warrants to search additional devices and email accounts. Even today the government has failed to claim the basis to which it believes the email is not  privileged and has stated that it does not know whether it intends to use the privileged communication at trial.

Unfortunately, unlike in other cases, the prosecution has been anything but transparent about the filter team procedures followed here; defense counsel have had limited visibility into what procedures followed, which suggests that the government did not follow its own "rigorous" procedures because at the very least the filter team should have communicated with defense counsel prior to giving the trial team access to the communication. The communication from the filter team should have inquired whether the defendants intended to assert privilege over the communication and if a dispute remained, such a dispute should have been limited before this Court—before the trial team accessed the communication. That did not happen. The Court cannot un-ring this bell, and therefore, the only remedy is dismissal of the superseding indictment, as the entire process has been tainted by the conduct of the government. The existing trial team and investigators reviewed a privileged communication, and relied on that communication to further the entire investigation leading to the superseding indictment. For

these reasons, the Court should dismiss the indictment for a gross violation of the defendants' attorney-client privilege.

### C.   Suppression Is Required

Absent dismissing of the superseding indictment in its entirety, all evidence seized from the improper use of the privileged communication should be suppressed.  When an affiant deliberately or recklessly disregards the truth in a warrant application and where the application's "remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."[13] *Franks v. Delaware*, 438 U.S. 154, 156 (1978); s*ee also United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). The court may hold a *Franks* hearing based upon a "substantial preliminary showing" by defendant that the affiant knew the truth and either recklessly or intentionally disregarded it by making a false statement in his or her affidavit and that the false statement was "necessary to the finding of probable cause." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). Similarly, courts have found that intentional or reckless omissions may provide a basis for a *Franks* challenge; thus, it follows that intentional or reckless inclusions may also provide a basis for a *Franks* challenge. *Id.*; *see also United States v. Gordon*, 346 F. Supp. 3d 999, 1011–12 (E.D. Mich. 2018) (holding that the government cannot use illegally obtained evidence to establish probable cause for a search warrant).

After the court concludes that the statement was intentionally or recklessly omitted—or, in this case, included—the inquiry turns to "whether, after putting aside erroneous information

---

[13] "The 'good faith' exception to the exclusionary rule permits the admission of evidence, though probable cause is lacking, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. However, this exception does not apply where . . . the magistrate was misled by information the affiant knew was false. . . ." *United States v. Guzman*, No. S5 97 CR 786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) (*citing United States v. Leon*, 468 U.S. 897, 920 (1987)) (internal quotation marks omitted).

and correcting material omissions, there remains a residue of independent and lawful information

sufficient to support a finding of probable cause or necessity." *United States v. Rajaratnam*, 719

F.3d 139, 146 (2d Cir. 2013) (internal quotations omitted); *see also United States v. Williams*,

656 F. App'x 751, 753–54 (6th Cir. 2016) (concluding that courts must excise illegally obtained

information from the affidavit and then decide whether the remaining legally obtained

information sufficiently supports a finding of probable cause to search).  With respect to this

inquiry, the burden of proof shifts to the government. *See Franks*, 438 U.S. at 156.

> 1.     **The  Affiant  Recklessly  or  Intentionally  Included  Privileged
>        Information**

Despite the government's knowledge that the ████████████ Email chain in question was

either privileged or potentially privileged, it intentionally or recklessly included communications

from the emails in its affidavit, and those privileged communications were *necessary* to the

finding of probable cause.  It should have been obvious from the contents of the ██████████

Email chain itself that they were privileged. In addition to the ████████████ attorneys, ███████

████████an attorney registered to practice in New York, no less—was one of the recipients of

the email. In any event, the government was made aware that there were multiple attorneys

included in the ██████████ Email chain.  Thus, the emails containing ██████████ should

have been flagged immediately and separately reviewed by a taint team so that the prosecutors

and agents assigned to this case were shielded from obviously privileged communications.

Moreover, the Defendants lodged numerous timely objections to the government's use of the

privileged emails.  Nevertheless, the government recklessly continued to rely upon and use the

privileged communication to build its case against the Defendants.  At every turn, every person

involved in the communication, including the attorneys themselves, insisted that the

communications were protected by the attorney-client privilege.  Faced with this obstacle, the

-16-

government continued to use the ████████ Email and potentially other emails as it built its

case against the Defendants.

Here, the government used communications it was not authorized to have in its

possession. This is akin to using illegally seized materials to establish probable cause for a search

warrant. *See Gordon*, 346 F. Supp. 3d at 1011–12.  In *Gordon*, the court held that the

government could not use evidence it illegally seized to establish probable cause for a search

warrant and, thus, ordered suppression of all evidence seized pursuant to the invalid search

warrant. *Id.*

It is of no consequence that the government lawfully seized the privileged ████████

Email chain, because the very purpose of a taint team is to avoid situations such as this where

properly seized evidence contains otherwise protected information that the trial team should not

have access to as they build their investigation.  In most cases, and in this case at least to some

extent, a taint team segregates emails that are not privileged from those that are privileged and

turns potentially privileged documents over to the defendant to allow an opportunity to assert

privilege. *See United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, *1 (S.D.N.Y.

Oct. 5, 2015); *United States v. Grant*, No. 04 CR 207BSJ, 2004 WL 1171258, at *3 (S.D.N.Y.

May 25, 2004) (denying defendant's motion to appoint a special master or judge and, instead,

allowing the government's taint team to conduct the initial privilege review); *see also Kaplan*,

2003 WL 22880914, at *12 ("this Opinion should be counted among those disapproving the

government's use of an ethical wall team to 'protect' the attorney-client and work-product

privileges or to determine whether the crime-fraud exception applies, where potentially

privileged materials are turned over to the trial team and case agents before any challenge to

those determinations can be raised by a Defendant and determined by a court"). If the taint team

believes an exception applies or privilege has been waived for a certain document, the proper

procedure is to request an *in camera* review by the court or otherwise allow the defendant an opportunity to assert that the document is protected by attorney-client privilege. *See Kaplan*, 2003 WL 22880914, at *11.

The Defendants have not been provided with that opportunity nor are they aware of *in camera* review relating to the ██████████ Email.  Rather, it appears the government recklessly violated the attorney-client privilege, repeatedly and cavalierly using privileged communications even after being told by the Defendants that the email was privileged.  At the very least, the ██████████ Email and any other email or communication associated with the Cannabis Venture where attorneys were involved should be suppressed. *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006).  In this case, however, because the privileged communications were used in numerous search warrant affidavits to establish probable cause, the only appropriate remedy is to suppress all of the evidence obtained from these search warrants.

> 2.    **The Government Cannot Show That the Affidavit, Excluding the Privileged Material, Establishes Probable Cause for the Warrants Issued**

The improper inclusion of privileged materials was necessary to the finding of probable cause in all of the search warrants that relied on the ██████████ Email.  It is clear that, without the ██████████ Email, probable cause lacked. *See Rajaratnam*, 719 F.3d at 146; *Williams*, 656 F. App'x at 753–54. Beginning with the search warrant affidavit submitted on October 9, 2019,[14] the government used the ██████████ Email to link ██████████ to the Cannabis Venture. Without the illegal use of the ██████████ Email, it is difficult to imagine how the government could have established probable cause to search for materials concerning the Cannabis Venture,

---

[14] *Supra*, note 10.

an otherwise lawful business effort.  After procuring the invalid October 9, 2019 search warrant, the government moved forward undeterred and applied for additional search warrants using both the ███████████ Email chain and the materials unlawfully obtained through the invalid October 9, 2019 search warrant.  This pattern of improper conduct continued over and over, with the government repeatedly relying on the ███████████ Email chain and unlawfully seized materials resulting from the government's impermissible use of privileged communications.  If the Court removes the ███████████ Email and all that it entails from the original and subsequent search warrant applications, there is not probable cause because there is no link between the Defendants and the other individuals that the government ultimately searched.[15]

### 3.    The Exclusionary Rule Requires Suppression

The Court should suppress the ███████████ Email chain, and all that flowed from it. "The exclusionary prohibition extends as well to the indirect as the direct products of . . . invasions [of the Fourth Amendment]." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041, at *59 (S.D.N.Y. Apr. 4, 2007).  As established above, the use of an invalid warrant constitutes an invasion of an individual's Fourth Amendment rights. *See Franks*, 438 U.S. at 156.  Though the defendant shoulders the initial burden of proving the nexus between the government's illegal conduct and the challenged evidence, the "[g]overnment bears the burden of proving that illegally obtained evidence is not fruit of the poisonous tree." *Vilar*, 2007 WL 1075041, at *59. In *Vilar*, the court concluded that the defendants had failed to identify "the fruits" or "the poisonous tree" and, thus, failed to meet their burden. *Id.*  In the present case, the poisonous tree is clear, as are the fruits—

---

[15] ████████████████████████████████████████████████████

all material seized pursuant to the invalid search warrants are the fruits of the privileged ███ ███ Email.[16]

The government's conduct prejudiced the Defendants and was "manifestly and avowedly corrupt." *See Schwimmer*, 924 F.2d at 447.  If courts sanctioned such conduct, the government could, in bad faith, build its case using privileged information and then argue that, because it believed the defendant's argument asserting privilege was incorrect, it did not need a hearing to proceed—thus, allowing the government to act as both prosecutor and judge. Allowing such egregious conduct would undermine the sanctity of attorney-client privilege and chill full and frank communication between attorneys and clients. *See Upjohn Co.*, 449 U.S. at 389.  For these reasons, the Court should sanction the government for repeatedly using the ███████ Email chain knowing it was a privileged communication by suppressing any and all evidence seized using the ███████ Email.[17]

## II.   SEVERANCE AND IMPROPER JOINDER

Defendant Igor Fruman respectfully moves the Court to sever Mr. Parnas from Mr. Fruman's trial and, in the alternative, to sever Count Seven and any evidence underlying the charges in Count Seven from Mr. Fruman's trial.

---

[16] Defendants recognize that they may not have standing to challenge the warrants executed against non-defendants; however, they maintain that they had a reasonable expectation of privacy in the email communications and chats seized by the government. *United States v. Riquelmy*, 572 F.2d 947, 950 (2d Cir. 1978); *see also United States v. DiTomasso*, 56 F. Supp. 3d 584, 591 (S.D.N.Y. 2014) (concluding that defendant had a reasonable expectation of privacy his email communications and private chats).

[17] Other remedies are also appropriate.  For example, the case agents and trial team that have been made aware and viewed the privileged communications should be removed from the case and replaced with prosecutors and agents that have not been tainted.  Moreover, if the grand jury was shown copies of the privileged communications, the government should be required to re-present the evidence to a new grand jury that has not been tainted by the improper use of privileged communications.

## BACKGROUND

In October 2019, United States Attorney for the Southern District of New York charged Lev Parnas, Igor Fruman, David Correia,[18] and Andrey Kukushkin in a four-count indictment alleging violations of campaign finance laws. *See*, Sealed Indictment, *United States v. Parnas, et al.*, S1 19 Cr. 735 (JPO), Dkt. #1.

Some eleven months later, in September 2020, the United States Attorney announced the Superseding Indictment which includes, as relevant here, a new charge based on completely unrelated conduct purportedly committed by Messrs. Parnas and Correia (the "Fraud Scheme"). Superseding Indictment, *United States v. Parnas, et al.*, S1 19 Cr. 735 (JPO), Dkt. #120. Count Seven charges Messrs. Parnas and Correia with conspiracy to commit wire fraud by inducing victims to invest in a venture called "Fraud Guarantee." *Id.* at 15–23. According to the Superseding Indictment, Messrs. Parnas and Correia misrepresented to investors that Fraud Guarantee was a start-up company intended to insure policyholders against corporate fraud. *Id.* at 16. The Superseding Indictment alleges that victims invested over $2 million. *Id.* at 15. However, the Superseding Indictment claims that Fraud Guarantee failed to become operational, and Messrs. Parnas and Correia spent a majority of the investors' money on personal expenses, including personal rent, luxury car leases, withdrawals of cash, and one political contribution of $50,000. *Id.* at 16, 17, 22. Notably, there is no suggestion that Mr. Fruman had any involvement with Fraud Guarantee or the charges associated with Count Seven, nor is there any suggestion that the conduct charged in Count Seven is related to Counts One through Six (the "Straw Donor Scheme" and the "Foreign National Donor Scheme").

For obvious reasons, the risks of spillover prejudices arising from the Fraud Guarantee evidence is extremely high, especially as it relates to Mr. Fruman. During the pendency of this

---

[18] *Supra* note 1.

action, the media has consistently referred to Messrs. Parnas and Fruman, collectively, as "[Rudy] Giuliani Associates."[19] Mr. Parnas has gained significant attention as "Giuliani's Ukrainian Middleman"[20] and has made multiple television appearances discussing his involvement in an unrelated Congressional investigation of President Donald Trump.[21] Moreover, in January 2020, Mr. Fruman learned that Mr. Parnas had produced, or was in the process of producing, potentially privileged information belonging to Mr. Fruman to the House Permanent Select Committee on Intelligence.[22]  For better or worse, the media has paired Messrs. Fruman and Parnas together, even though they are far apart, both in their strategy for defending this case and in the conduct alleged by the Superseding Indictment as it relates to Count Seven.  There is no curative instruction or other means of fairly separating Mr. Fruman from Mr. Parnas in a trial that will involve multiple emails, text messages, and testimony that will show that Mr. Fruman and Mr. Parnas were close business associates for many years.  Mr. Fruman, however, was not involved in Fraud Guarantee, but the spillover prejudice he will suffer

---

[19] Rebecca Davis O'Brien, *Giuliani Associates Face New Federal Criminal Charges*, WSJ, Sept. 17, 2020, https://www.wsj.com/articles/giuliani-associates-face-new-federal-criminal-charges-11600383496; Jonathan Stempel, *Guilty Plea Entered in U.S. Case Linked to Former Giuliani Associates*, REUTERS, Oct. 29, 2020, https://www.reuters.com/article/us-usa-trump-giuliani/guilty-plea-entered-in-u-s-case-linked-to-former-giuliani-associates-idUSKBN27E2B6; William K. Rashbaum and Ben Protess, *Lev Parnas, Giuliani Associate, Faces New Fraud Charges*, N.Y. TIMES, Sept. 17, 2020, https://www.nytimes.com/2020/09/17/nyregion/lev-parnas-charged.html.

[20] Katelyn Polantz and Michael Warren, *Connected By Subpoenas: Giuliani and His Ukrainian Middleman Lev Parnas Face Increased Scrutiny*, CNN POLITICS, Oct. 1, 2019, https://www.cnn.com/2019/10/01/politics/giuliani-parnas-ukraine-subpoena/index.html.

[21]Including appearances on the Rachel Maddow Show and Anderson Cooper 360. Allan Smith, *Key Things We Learned From Lev Parnas' Revealing MSNBC Interview*, https://www.nbcnews.com/politics/trump-impeachment-inquiry/key-things-we-learned-lev-parnas-revealing-msnbc-interview-n1116931; *Anderson Cooper 360: Part 1 of Anderson Cooper's Interview with Lev Parnas*, Jan. 17, 2020, https://www.msn.com/en-us/news/politics/part-2-of-anderson-coopers-interview-with-lev-parnas/vi-BBZ2pUa; *Anderson Cooper 360: Part 2 of Anderson Cooper's Interview with Lev Parnas*, Jan. 17, 2020, https://www.cnn.com/videos/politics/2020/01/17/lev-parnas-ukraine-trump-yovanovitch-ac360-part-2-vpx.cnn.

[22] T. Blanche Letter to J. Oetken, *United States v. Parnas, et al.*, S1 19 Cr. 725 (JPO) (Jan. 22, 2020).

if the government is permitted to introduce evidence of that separate and unrelated scheme at the same trial that is otherwise simply a series of allegations involving campaign finance laws will no doubt result in an unfair and unconstitutional trial for Mr. Fruman.

### A.       Severance, Generally

Federal Rule of Criminal Procedure 8(b) permits joinder when the alleged criminal acts of each defendant arise from either (1) a "substantial identity of facts or participants," or (2) a common plan or scheme. *United States v. Rogiers*, No. 17-CR-503 (AJN), 2018 WL 3471812, at *1 (S.D.N.Y. July 5, 2018). While joinder may be proper if one offense depends on the commission of another, or evidence of one offense constitutes or depends on evidence of another, *United States v. DiScala*, No. 14-CR-399 (ENV), 2018 WL 1187394, at *19 (E.D.N.Y. Mar. 6, 2018), "two separate transactions do not constitute a series within the meaning of Federal Criminal Rule of Criminal Procedure 8(b) merely because they are of a similar character or involve one or more common participants." *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995). Courts have established a preference for a joint trial where defendants were indicted together; however, "unless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice." *Id.* at *2.

The Court may also exercise its discretion to order severance where joinder prejudices one or more of the defendants under Federal Rule of Criminal Procedure 14. *Rogiers*, 2018 WL 3471812, at *3.  In fact, the United States Supreme Court has ruled that Rule 14 requires severance when there exists a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment of guilt or innocence. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  Indeed, "[t]here are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs

the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

### B.   Severance of Defendants

The Court should sever the trials of Mr. Fruman and Mr. Parnas because a joint trial will unfairly prejudice Mr. Fruman and preclude him from a fair trial.  Courts have recognized that a joint trial may precipitate prejudice if the quality and quantity of evidence against one defendant would spill over to the co-defendants, *United States v. Cambindo-Valencia*, 609 F.2d 603, 629 (2d Cir. 1979), or the evidence against one defendant increases the possibility that the jury will infer one defendant's guilt based on the "enhanced likelihood of the guilt of the other defendant." *United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980); *see also United States v. Davis*, No. 17 CR. 610 (LGS), 2018 WL 4373998 *4 (S.D.N.Y. 2018) (granting a motion to sever one of the defendants from defendants charged with violent acts, reasoning that there would be a substantial risk of prejudice if evidence of the violent acts were admitted against a defendant who was not charged with involvement in the violent acts); *United States v. Barnes*, No. S9 04 Civ. 186 (SCR), 2008 WL 239408 at *1 (S.D.N.Y. 2008) (concluding that severance was warranted for a defendant who was not eligible for the death penalty).

In *United States v. Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990), the court granted severance of a count in which only one of the defendants participated. The court then severed the non-moving defendant from the indictment entirely, concluding that severance was necessary in order to preserve judicial resources and prevent undue prejudice to the other two defendants. *Id.* In that case, three defendants were joined in a single indictment charging all three with count one —conspiring to sell old cargo planes, and charging only one of the defendants with count two— conspiring with two unindicted co-conspirators to sell anti-aircraft missiles. *Id.* at 1136. In granting the motion to sever the counts, the court agreed with defendants that evidence

concerning count two would be prejudicial to other defendants because, while "conspiring to sell old cargo planes [is] hardly . . . inflammatory," count two involved inflammatory evidence that would possibly prejudice the other two defendants. *Id.* at 1138; *see also Davis*, 2018 WL 4373998, at *4. The court then considered that, under Federal Rule of Evidence 404(b), the inflammatory evidence of count two would be admissible against the non-moving defendant at the trial for count one; thus, the court deemed it necessary to sever the non-moving defendant from the trial of the other defendants to avoid undue prejudice and waste of judicial resources. *Menashe*, 471 F. Supp. at 1138–39.

The inflammatory evidence showing that Mr. Parnas essentially engaged in a Ponzi scheme coupled with Mr. Parnas's public persona weigh in favor of trying Mr. Parnas separately from Mr. Fruman. Like the evidence to support count two in *Menashe*, the evidence to support Count Seven in the present case is inflammatory and, as discussed above, would prejudice Mr. Fruman. Yet, just as in *Menashe*, severance of the counts would not prevent the admission of evidence of the Fraud Scheme against Mr. Parnas under Fed. R. Evid. 404(b). Evidence of the Fraud Scheme potentially introduced against Mr. Parnas to show, *inter alia*, intent, plan, or *modus operandi* would prejudice Mr. Fruman, particularly in light of evidence that Mr. Parnas and Mr. Fruman were engaged in other joint business ventures, including those alleged in Counts One through Six. In reality, Mr. Fruman believed that he and Mr. Parnas were operating legitimate businesses and were operating within the law when they made certain campaign contributions. If the jury hears evidence that Mr. Parnas was engaged in a scheme to defraud investors, it is highly likely they will conclude that both Mr. Parnas and Mr. Fruman had the requisite intent to violate campaign finance laws. The spillover prejudice of the Fraud Scheme will make it impossible for Mr. Fruman to receive a fair trial.

Moreover, Mr. Parnas has already begun trying this case in the court of public opinion and has gained a great deal of attention in the media through his efforts.  In so doing, he has become the face of the indictment and was described in the news as "Rudy Guiliani's Ukrainian Middleman," while Mr. Parnas and Mr. Fruman have, collectively, been repeatedly referred to as "Giuliani's Associates."  In his quest to spin his version of what happened to the public, he has increased attention surrounding the conduct charged in the Superseding Indictment and blurred the lines between the narrow campaign finance charges in the Superseding Indictment and unrelated media inquiries regarding Mr. Parnas's relationship with President Trump and other well-known political figures.  Some media outlets have already confused facts to the detriment of Mr. Fruman.  In a recent Twitter post by the London Times, it incorrectly stated that "both Parnas and Fruman have since been charged with wire fraud."[23]  Although it should be expected that the media will make efforts to report the news accurately, it is no surprise that Mr. Fruman is linked to Mr. Parnas given their business dealings.  No curative instruction can separate them and the result, unfortunately, will be that Mr. Fruman will not be judged based on the evidence in Counts One through Six, but he will be judged by the jury based upon the evidence of fraud and deception that comprise Count Seven even though he was not involved and never has been involved in the conduct underlying the Fraud Scheme.[24]

Accordingly, the vast amount of evidence demonstrating Mr. Parnas's intent, the antagonistic nature of Mr. Fruman's and Mr. Parnas's defenses, and Mr. Parnas's public persona

---

[23] "Both Parnas and Fruman have since been charged with wire fraud and attempting to use Fraud Guarantee as a conduit to direct money from a foreign government to U.S. politicians in relation to Ukraine."  The Times (@thetimes), TWITTER (Nov. 10, 2020, 11:41 AM), https://twitter.com/thetimes/status/1326203260076777472?s=20.

[24] Mr. Parnas has also either engaged in antagonistic behavior against Mr. Fruman or with blatant disregard toward Mr. Fruman's defense. This is best demonstrated by his production of potentially privileged documents belonging to Mr. Fruman.

would prevent the jury from making a reliable judgment on Mr. Fruman's innocence; thus, the Court should exercise its discretion under Rule 14 to sever the defendants.

### C. Improper Joinder of Count Seven

If the Court does not sever the trials for Mr. Parnas and Mr. Fruman, then the Court should find joinder of Count Seven improper and, thus, sever Count Seven from the trial of Counts One through Six. Courts have found joinder improper when there exists no colorable argument that both conspiracies allegedly arose from a single, overarching scheme without common identity of participants. *United States v. Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996); *see also Lech*, 161 F.R.D. 255 (finding joinder of three similar but separate conspiracies improper notwithstanding the presence of a common defendant and similar objectives because there was no suggestion that the moving defendant knew of or participated in the schemes other than the one with which he was charged). In *Kouzmine*, the court granted defendants' motion to sever counts stemming from one conspiracy from counts stemming from a second conspiracy because the two conspiracies lacked an overarching scheme and common participants. *Id.* In so doing, the court acknowledged that, while each conspiracy involved two of the same defendants and the second conspiracy may have "arose in consequence of [the two defendants'] falling out with [the third]," there was no common purpose or evidence that the defendants participated in all of the schemes alleged. *Id.* at 1133–34.

In its decision in *United States v. Greenfield*, No. 01 CR 401 (AGS), 2001 WL 1230538, at *3 (S.D.N.Y. Oct. 16, 2001), the court applied *Kouzmine* and *Lech* to find joinder improper because "there was some overlap among the alleged conspiracies, but no unifying purpose." Notably, it reasoned that the indictment did not allege that the moving defendant even knew of the conspiracy. *Id.* Similarly, in *United States v. Yaron*, No. S2-10-CR-363 GBD, 2011 WL 3279054, at *1–*2 (S.D.N.Y. July 28, 2011), the court severed two conspiracy counts alleging

fraud in contracting, because "the Superseding Indictment fail[ed] to establish a 'key link'
between the Asbestos/Construction and HVAC conspiracies sufficiently indicating that 'one
scheme stemmed from the other' or that they were 'part and parcel' of each other." *Id.* at *9.
Further, the court in *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 308 (S.D.N.Y. 2010),
granted a motion to sever counts when one of the defendants planned both schemes, but the
moving defendant participated in only one of the schemes, and a common plan did not exist.

The Superseding Indictment does not allege that Mr. Fruman took part in or even knew of
the Fraud Scheme, that any of the facts underlying any of the first six counts also support Count
Seven, or that Count Seven relates in any manner to the other counts. Thus, joinder was improper
under Rule 8(b), and Count Seven should be severed.  Similar to the circumstances in the above-
cited cases, the Superseding Indictment here does not indicate the existence of an overarching
scheme or a common identity of participants.  In fact, the Superseding Indictment organizes each
of the seven counts according to the alleged overarching scheme to which they are related.
While Counts One through Six "incorporate the allegations contained in paragraphs 1 through
12"—the allegations underlying the alleged Campaign Finance Schemes—Count Seven stands
on only the allegations specific to the Fraud Scheme.  Thus, while all other counts depend on
proof of the alleged Campaign Finance Scheme, Count Seven stands independently and, just as
proof of Counts One through Six would not prove the government's case for Count Seven, proof
of Count Seven would not prove the government's case for Counts One through Six.  In
*Kouzmine*, *Lech*, and *Greenfield*, the court ruled that joinder was improper even though one of
the conspiracies may have arisen in consequence of another (*Kouzmine*), the conspiracies were
similar (*Lech*), or there existed some overlap between conspiracies (*Greenfield*).  Here, no such
similarity, cause and effect, or overlap exist, providing additional reason for the court to find
joinder improper. Accordingly, because the Superseding Indictment failed to establish a key link

-28-

between the alleged Fraud Scheme and Campaign Finance Scheme, severance is warranted.  *See Yaron*, 2011 WL 3279054, at *1.

Even if the court determines that joinder is proper under Rule 8(b), severance under Rule 14 is warranted because joinder of Count Seven lacks any relation to the other counts; thus, it would serve only to prejudice the jury against Mr. Fruman.  Proof of Count Seven apparently involves inflammatory evidence that Mr. Parnas engaged in a Ponzi scheme with the intent to defraud investors by inducing them to invest in a company that never came to fruition.  In so doing, he ultimately stole and spent their money on personal extravagances. For Counts One through Six, the jury will hear that Mr. Parnas and Mr. Fruman were business partners, allegedly engaged in a joint venture to gain political influence to bolster their otherwise lawful businesses. However, Mr. Fruman was not involved in the Fraud Scheme, and the Superseding Indictment does not allege that he even had knowledge of the scheme.  Thus, trying Count Seven in the same proceeding carries the risk of confusing the issues and misleading the jury.

## III.   MISCELLANEOUS RELIEF

In addition to the relief sought above, Mr. Fruman also respectfully joins in the motions filed by all defendants in this case, to the extent not adverse to our own.  Mr. Fruman also respectfully requests leave to file additional motions as he continues to review discovery and after additional expected discovery is produced, as well as motions *in limine* in advance of trial at a schedule to be determined by the Court after a trial date is confirmed.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court suppress the ███████████ Email chain as well as all documents seized and information obtained from those documents, and Mr. Fruman's respectfully requests that the Court grant his motion to sever.

Dated:  December 1, 2020

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

By: ___/s/ Todd Blanche_____

    Todd Blanche
    Sara Bussiere
    Timbre Shriver

    200 Liberty Street
    New York, NY 10281
    Tel.:  (212) 504-6000
    Fax:  (212) 504-6666
    todd.blanche@cwt.com
    sara.bussiere@cwt.com
    timbre.shriver@cwt.com
    *Attorneys for Defendants*