UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                      :
    UNITED STATES OF AMERICA
                                                                      :
              - v. -
                                                                      :     S1 19 Cr. 725 (JPO)
    IGOR FRUMAN,
                                                                      :
                                Defendant.
                                                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**THE GOVERNMENT'S SENTENCING SUBMISSION**


                                            DAMIAN WILLIAMS
                                            United States Attorney
                                            Southern District of New York


Rebekah Donaleski
Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys
        - *Of Counsel* -

The Government respectfully submits this letter in advance of the sentencing of Igor Fruman, scheduled for January 21, at 2 p.m.  Fruman has admitted soliciting one million dollars in foreign contributions to be given to American political candidates, thereby trying to corrupt U.S. elections to advance his own financial interests.  As the Court saw at the recent trial of Fruman's co-defendants, Fruman was a central player in that scheme.  For the reasons set forth below, a sentence within the stipulated United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 37 to 46 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

I.      **BACKGROUND**

The Court is familiar with Fruman's conduct from presiding over the October 2021 trial of Lev Parnas and Andrey Kukushkin.[1]  In short, Fruman solicited one million dollars from Russian oligarch Andrey Muraviev for the stated purpose of illegally donating that money to candidates in United States federal and state elections.  Fruman personally did much of the soliciting, urging Muraviev and Kukushkin to transfer the million dollars to the United States so that the illegal political contributions could be made.  When Muraviev agreed, Fruman channeled the transfers to a bank account controlled by Fruman's brother—and unconnected to the cannabis business that the contributions were intended to support—in order to help conceal the illegal foreign origin of Muraviev's funds.  Over $150,000 of Muraviev's money was ultimately donated to candidates in the 2018 election cycle, much of it under Fruman's name.  (*See* PSR ¶¶ 20-30).

---

[1]      The PSR's description of Fruman's offense conduct, which Fruman does not dispute, is derived in significant part from the trial record.  (*See* PSR ¶¶ 16-31).  It is also independently appropriate for the Court to consider a co-defendant's trial record when sentencing a defendant who pled guilty.  *See United States v. Romano*, 825 F.2d 725, 729 (2d Cir. 1987); *United States v. Babilonia*, 687 F. App'x 63 (2d Cir. 2017).

1

On October 10, 2019, the defendant was arrested for the above conduct. (PSR p. 2). On September 10, 2021—approximately one month before the scheduled trial—Fruman pled guilty, pursuant to a plea agreement, to one count of soliciting campaign contributions from a foreign national, in violation of 52 U.S.C. §§ 30121 and 30109(d)(1)(A). As part of the plea agreement, Fruman agreed that the value of the illegal transactions at issue was between $550,000 and $1,500,000, and that the recommended sentence under the United States Sentencing Guidelines ("U.S.S.G" or the "Guidelines) was 37 to 46 months' imprisonment. (*See* PSR ¶ 10). The Probation Office reached the same calculation. (*See* PSR ¶ 76).

## II.    SECTION 3553(a) ANALYSIS

The factors enumerated in 18 U.S.C. § 3553(a) strongly support a Guidelines sentence in this case.

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of Fruman's crime warrants a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1). Fruman played a lead role in inducing Muraviev to transfer one million dollars to Fruman and Parnas, for the express purpose of using that money to influence U.S. elections. As the Court will recall, many of the most shameless solicitations in this case come from Fruman: It was Fruman who sent both the initial "Cannabis Schedule and Budget" and the later "SIG Contribution List" to Kukushkin and Muraviev, detailing plans to illegally distribute Muraviev's money to American political candidates. (GX 33, 61). It was Fruman who hectored the Russian side of the conspiracy to send the money. (*See, e.g.*, GX 43 ("It's important to transfer 500 . . . the transfer must be done tomorrow morning!!!!!"); GX 58 ("We will fuck up everything again!! Where is the money, Andrey?!"). It was also Fruman who promised that those contributions gave Muraviev influence over their recipients. (*See, e.g.*, GX 59 ("Today Florida became ours forever!!!!! Congratulations!!!!!!"); GX 86 (promising Kukushkin and Muraviev that

the success of the group's candidate would quickly translate into licenses to sell marijuana).  And Fruman also gave some of the clearest statements that he knew these transfers had to be concealed. (*See, e.g.*, GX 58 (telling Kukushkin that the second $500,000 transfer should be executed "using the old scheme to avoid problems later"); GX 82 (scolding Kukushkin for discussing the transfers with Deanna Van Rensburg by stating, in part, "Andrey, what kind of mushroom did you eat today!?" "What are these discussions with our secretary???????").  In short, Fruman ran a scheme to influence U.S. elections with foreign money from start to finish, and should receive the recommended sentence for that serious crime.

Fruman claims that the Guidelines to which he stipulated "are inappropriately high because of the fraud loss amount."  (Fruman Sub. 4).  But there is no "fraud loss amount" here; Fruman pled guilty to soliciting $1,000,000 in foreign contributions to U.S. elections, not to fraud.  And it is difficult to see how a court could measure the magnitude of such a crime other than by using the dollar amount.  A million dollars in foreign money is likely to influence American elections ten times as much as $100,000 in foreign money would, and one hundred times as much as $10,000 in foreign money would.  That makes the cases on which Fruman relies inapplicable, because they concerned much higher Guidelines driven by far greater dollar figures unrelated to any real harm. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (rejecting twenty-year sentences for failed attempt to defraud non-existent investment fund of $400 million dollars);[2] *United States v.*

---

[2]     Fruman also errs in claiming that "the Second Circuit has cautioned that the loss enhancement is 'fundamentally flawed,'" citing "*Corsey*, 723 F. 3d at 380."  (Fruman Sub. 5). Fruman is in fact citing to a concurrence by a district judge, who was sitting in the Second Circuit by designation.  The Circuit's majority opinions have certainly held that a district court should consider departing from the loss Guidelines where they result in a disproportionate sentence, but that court has never suggested that the loss Guidelines should simply be thrown out the window. *See, e.g.*, *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

*Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (rejecting 78 to 97 month Guidelines range based on five to fifteen million dollars in insider trading gain, none of which actually went to the defendant); *cf. United States v. Pan*, 12 Cr. 153 (RJS), Dkt. 204 at 30-31 (finding that loss guidelines *under*stated harm for campaign finance crime with only $8,400 in donations).

Moreover, Fruman flips the record on its head in claiming that "the main purpose" of Muraviev's money "was to start a business," and that Fruman should not be penalized as if he "had defrauded investors or even outright stolen the money." (Fruman Sub. 5). As the Court saw at trial, the entire $1,000,000 was expressly earmarked—by Fruman himself—for political contributions. (*See, e.g.*, GX 33, 61). And although much of the money did not in fact make its way to political candidates, that was quite literally because Fruman (and Parnas) "had defrauded investors" and "outright stolen the money." When Fruman and Parnas repurposed some of Muraviev's money to pay off credit card bills for luxury travel, golf outings, and the like, they defrauded and stole from Muraviev and Kukushkin. (*See* GX 1403 (tracing expenditure of Muraviev's funds)).[3] Although Muraviev and Kukushkin deserve no sympathy for being partly defrauded out of their earnest efforts to illegally influence U.S. elections, Fruman can hardly seek leniency for committing crimes against his co-conspirators as well as with them. Nor is it even true that Fruman's theft meant that he really sought less than a million dollars to contribute. As the Court also saw, after Fruman and Parnas spent Muraviev's first million on both illegal contributions and personal benefits, Fruman requested another two million dollars from Muraviev. (*See* GX 82 (requesting

---

[3]    Fruman claims that the credit card bills repaid with Muraviev's funds were for "debt incurred by Mr. Fruman and his business partners in the course of starting the cannabis venture." (Fruman Sub. 8). Leaving aside the debts from the illegal campaign contributions, this appears to be false. It is difficult to see how spending $480 at Cirque Du Soleil, $817 at a pet spa, or for that matter $9 on "GoGoGrandparent" (GX 1403) had anything to do with starting a cannabis venture.

"2 million" for "adding regarding our program," listing a series of states, and urging that the "decision has to be made today")).

B.  **The History and Characteristics of the Defendant**

Fruman's history and characteristics also provide no reason to depart from the Guidelines. To be sure, Fruman has no prior convictions, but the Guidelines already incorporate that into the recommended sentence.  Beyond that, Fruman's arguments do more to show a lack of candor than a legitimate basis for leniency.

For example, Fruman proclaims his "everlasting devotion to his family and religion," as shown by, among other things, serving as the "primary caretaker" for his wife.  (Fruman Sub. 2, 8).  In fact, Fruman is separated from his wife.  (PSR ¶ 60).  And it appears that Fruman misled the Probation Office about why:  Fruman told the probation officer that they "separated in 2017 due to his arrest and legal situation."  (*Id.*).[4]  But in 2017, Fruman had neither an arrest nor a legal situation, because the crimes at issue here did not occur until 2018.

Fruman claims that his incarceration will impose burdens on his family.  (Fruman Sub. 1, 2).  This is unfortunately likely to be true, as it is in the case of every defendant who chooses to commit a felony after starting a family. For that reason, courts will not typically consider a defendant's claim of family hardship at sentencing absent truly "extraordinary" circumstances. *See United States v. Nivar*, 2003 WL 21488061, at *4 (S.D.N.Y. June 26, 2003) (collecting cases); *cf.* U.S.S.G. § 5H1.6 ("family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted").  Fruman has not identified any facts so extraordinary as

---

[4]      The year, 2017, is not likely a typo by the Probation Office.   Fruman's wife has independently confirmed that they have long been separated, and that in 2017 she filed for divorce from Fruman.  Instead, Fruman appears to have simply fabricated an explanation for his separation that would be more consistent with portraying the image of a family man.

to defeat that rule:  Although he has children, their mother lives in the same city as them, and she would be able to care for them in his absence.  (PSR at p. 22).  Similarly, Fruman's mother already resides in an assisted living facility.  (PSR ¶ 56).  That Fruman's crime will also cause his family to suffer is tragic, but it cannot allow Fruman to escape just punishment.

Nor can Fruman seek leniency on the grounds of some charitable giving.  (*See* Fruman Sub. 1).  Sentencing courts do not typically consider claims of charitable works and standing in the community, absent an extraordinary showing.  *See* U.S.S.G. § 5H1.11 ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (requiring "exceptional degree of public service and good works" under § 3553(a)).[5]  That is in part because many defendants do not have the resources—in time, money, or social standing—to perform such deeds, and so the law is reticent to show leniency to the few defendants who are fortunate enough to have such options.  *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity.  They are to be commended for doing so but

---

[5]    *Canova* provides guidance whether this Court considers public service under the Guidelines or Section 3553(a).  In the appeal in that case, the initial question was whether the defendant qualified for a departure under the Guidelines.  *Canova*, 412 F.3d at 358.  But because *Booker* had been decided between the defendant's sentencing and appeal, and because the Circuit remanded to the district court on other grounds, the Circuit discussed the propriety of considering the defendant's public service both under the Guidelines and under Section 3553(a).  *Id.* at 358-59 & n.29.  Similarly, although many of the cases discussed in this section concern U.S.S.G. § 5H1.11, the cases' reasoning—and the reasoning of the Sentencing Commission in enacting Section 5H1.11—bears on the weight that should be accorded to the defendant's claims under § 3553(a).  *See, e.g.*, *United States v. Repking*, 467 F.3d 1091, 1095-96 (7th Cir. 2006) (faulting sentencing analysis under § 3553(a) because defendant's charitable works were not so extraordinary "that they should be given weight despite the contrary view of the Sentencing Commission.").

should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence."). Fruman has not shown any charitable activity of the extraordinary character that the law requires. To the contrary, he appears to have engaged in limited charity in the same community where he does business, acts that he may have done as much to increase his social standing and business opportunities as to reflect genuine benevolence. *See Repking*, 467 F.3d at 1095-96 (discounting "charitable works" that were "entirely consistent with [the defendant's] business development plan"); *Morken*, 133 F.3d at 630 (discounting charitable and public-oriented acts of prominent local businessman).

## C. The Need to Reflect the Seriousness of the Offense

Fruman should also receive a Guidelines sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). The

serious nature of trying to funnel a million dollars from a Russian oligarch into U.S. elections is obvious.  As Judge Sullivan, then sitting in this District, explained when imposing a Guidelines sentence for a vastly smaller crime, "the damage done" by illegal campaign contributions "in adding to what could fairly be characterized as public cynicism over this process is incalculable . . . it's a very serious crime for that reason because it makes people shrug and say the system is corrupt."  *Pan*, Dkt. 204 at 31.

To justly punish that crime, thereby promoting respect for the law, requires a serious sentence.  As Judge Rakoff explained in *Gupta*—a case on which Fruman repeatedly relies— "[w]hile no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose."  904 F. Supp. 2d at 355; *see also United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 46 ("Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath.").

Fruman claims that his endurance of home detention, financial costs, and damage to his business reputation suffice to provide just punishment.  Far from it.  Fruman spent his home detention in a high-rise Florida condominium worth over two million dollars, enjoying not one but two beachside balconies.  (*See* PSR ¶ 63; Fruman Net Worth Statement at 2).  And his home detention apparently did not prevent him from spending $167 a month in gas for his Porsche, Cadillac, and Land Rover.  (PSR ¶ 73; Fruman Net Worth Statement at 3).  Many, many Americans would sign up for such arduous confinement tomorrow.  And although Fruman's earnings and business reputation no doubt suffered harm from this case, few people would recognize that as just

punishment for the serious crimes here, especially given that what Fruman claims to have lost—

his ability to be a wealthy international businessman—is not an opportunity most ever had. *See*

*Binday*, Dkt. 349 at 45 (explaining need for sentence to show that "this sort of behavior is every

bit as reprehensible as the types of crimes for which I and others like me routinely send poor,

disadvantaged persons to prison for dozens of years").

For similar reasons, this Court should impose a Guidelines fine, meaning a fine between

$15,000 and $150,000. (PSR ¶ 84).[6] Fruman absurdly claims that he is unable to pay such a fine.

(Fruman Sub. 11-12). But he could, for example, downsize to a home that costs *only* $1,500,000,

and still have funds left over to pay the statutory maximum fine twice over. It is similarly unclear

why he also requires a $6,400 per month condominium apartment for his wife (PSR ¶ 73), or why

the defendant himself needs three luxury vehicles and a separate apartment in Ukraine (Fruman

Net Worth Statement at 2-3). Fruman plainly has the ability to pay a fine, and should do so.[7]

**D.  The Need to Afford Adequate Deterrence and Protect the Public**

The need to afford adequate deterrence and to protect the public from any further crimes

by Fruman weighs in favor of a sentence within the Stipulated Guidelines Range. *See* 18 U.S.C.

§§ 3553(a)(2)(B) and 3553(a)(2)(C). General deterrence is particularly important in cases such as

this one. As *Gupta* explains and as this Court saw, white collar crimes like Fruman's are extremely

---

[6]      The statute of conviction does not provide for forfeiture, and there are no identifiable proceeds for purposes of restitution.

[7]      The Government also has reason to believe that Fruman has concealed his overseas assets from the Court. Fruman's net worth statement reflects the ownership of a single apartment worth $150,000 in Ukraine. (*See* Fruman Net Worth Statement 3). Yet Fruman has advertised himself as the head of Otrada Luxury Group, which purportedly owns a luxury hotel, a night club, jewelry stores, and other valuable property in Ukraine. (*See* Ex. A). The Government's investigation has indicated that these claims are valid in at least significant part—although if they were fraudulent that would also not reflect positively on Fruman. Given, however, that Fruman's considerable U.S. wealth more than suffices to pay a Guidelines fine, the Court need not resolve this matter.

difficult to detect. "Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *Gupta*, 904 F. Supp. 2d at 355; *see also, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)).

This Court should also reject Fruman's claim that his age suffices to prevent recidivism. (Fruman Sub. 9-10). To start, even if that were so, it would not eliminate the need for general deterrence. *See Gupta*, 904 F. Supp. 2d at 355. And given that the defendant began committing the instant crime at age 53, having now turned 55 cannot provide much assurance that age has changed his ways. Instead, the general rule that age decreases recidivism has more force when the defendant's initial offense occurred in his youth—as the cases Fruman cites show. *See United States v. Sloane*, 308 F.R.D. 85 (E.D.N.Y. 2015) (lenient sentence appropriate for 53 year-old who failed to register as a sex offender after having committed a sex offense when he was 25 years old, because age indicated he was unlikely to commit another sex offense); *Simon v. United States*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) (considering fact that defendant would be 50 years old when released from prison during resentencing of defendant originally sentenced to 322 months' imprisonment for crack distribution). Moreover, Fruman's submission manifests a blatant contempt for the law: Between claiming that he is unable to pay the $15,000 fine recommended by probation while owning a Porsche, and falsely claiming that he primarily sought to establish a

legitimate cannabis business with Muraviev's money, Fruman's submission makes plain that he views this case an inconvenience to evade, and not an opportunity for reformation. Thus, although general deterrence remains the primary concern, this Court should not take for granted that Fruman will not re-offend if given the slap on the wrist he requests.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 37 to 46 months' imprisonment and a $15,000 to $150,000 fine would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        January 14, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:     /s/_____
Rebekah Donaleski
Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys