UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
| - v. - | : |
| LEV PARNAS, | : |
| IGOR FRUMAN, | |
| DAVID CORREIA, | : |
| ANDREY KUKUSHKIN, and | |
| ANDREY MURAVIEV, | : |
| a/k/a "Andrey Muravyov," | |
| | : |
| Defendants. | |
| | : |

**SEALED**
**SUPERSEDING INDICTMENT**

S2 19 Cr. 725 (JPO)

- - - - - - - - - - - - - - - - - x

### INTRODUCTION

#### The Campaign Finance Schemes

1. Through its election laws, Congress prohibits foreign nationals from making contributions, donations, and certain expenditures in connection with federal, State, and local elections, and prohibits anyone from making contributions in the name of another. Congress further requires public reporting through the Federal Election Commission (the "FEC") of the sources and amounts of contributions and expenditures made in connection with federal elections. A purpose of these laws, taken together, is to protect the United States electoral system from illegal foreign financial influence, and to further inform all candidates, their campaign committees, federal regulators, and the public of (i) the true sources of contributions to candidates for federal

office; and (ii) any effort by foreign nationals to influence federal, State, or local elections with foreign money.

2. LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendants, conspired to circumvent the federal laws against foreign influence by engaging in a scheme to funnel foreign money to candidates for federal and State office so that the defendants could buy potential influence with candidates, campaigns, and the candidates' governments. The defendants concealed the scheme from the candidates, campaigns, federal regulators, and the public by entering into secret agreements, laundering foreign money through bank accounts in the names of limited liability corporations, and through the use of straw donors (also known as "conduits" or "straw contributors") who purported to make legal campaign contributions in their own names, rather than in the name of the true source of the funds.

3. LEV PARNAS and IGOR FRUMAN, the defendants, made additional contributions to federal candidates, joint fundraising committees, and independent expenditure committees that either (i) were intentionally made in the name of a limited liability corporation, in order to conceal that FRUMAN was the true source of the contributions and make it appear as though the limited liability corporation was actually an established energy company

2

with real revenue and assets; or (ii) were reported in PARNAS's name but were in fact funded by FRUMAN, which made it appear that PARNAS was actually the donor and resulted in FRUMAN exceeding limits on contributions to candidates or committees to whom FRUMAN had previously contributed.  By concealing that FRUMAN was the true source of these contributions made in the name of the company and PARNAS, respectively, the defendants sought to falsely bolster the reputation of the company, and also to falsely bolster PARNAS's reputation and make it appear as if he had sufficient funds to make the contribution.  With respect to the company, in particular, by concealing that FRUMAN funded the contribution, PARNAS and FRUMAN sought to make the company appear to be a legitimate, established venture capable of making a substantial six-figure contribution when, in fact, it was not.  Moreover, PARNAS and FRUMAN, with the assistance of DAVID CORREIA, the defendant, further concealed this aspect of the conspiracy by, among other things, making and causing others to make false statements to the FEC.

## *THE CAMPAIGN FINANCE LAWS*

4.    The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Section 30101, *et seq.*, (the "Election Act"), prohibits certain financial influences on the election of candidates for federal office.

3

5.     To prevent the influence of foreign nationals on elections, the Election Act prohibits foreign nationals, directly or indirectly, from making any contributions or donations in connection with federal, State, or local elections. Additionally, to limit the influence that any one person could have on the outcome of a federal election, the Election Act establishes limits on the amounts that even United States citizens or lawful permanent residents can contribute to a federal candidate and the candidate's authorized committee, including joint fundraising committees, which are committees established for the purpose of fundraising for multiple committees at the same time.

6.     To prevent individuals from circumventing the Election Act, and to enable the detection of attempts to circumvent the Act, the Election Act also prohibits a person from making a political contribution in the name of another in connection with any federal election, including, for example, by giving funds to a straw donor for the purpose of having the straw donor pass the funds on to a federal candidate or to a candidate's federal campaign committee or joint fundraising committee as a donation from the straw donor, rather than in the name of the true source of the money. The Election Act also prohibits contributing in the name of another to an independent expenditure committee spending to influence the outcome of that federal campaign.

4

7.    The FEC is an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, in part by requiring candidates, joint fundraising committees, and independent expenditure committees to file regular reports of the sources and amounts of the contributions they receive.  To deter abuses of the Election Act and instill public confidence in the election process against corruption and the appearance of corruption, the Election Act requires the FEC to publish the reports that it receives so that all of the candidates, the entire public, and law enforcement may all see the specific information about the amounts and sources of political contributions and expenditures involving federal candidates and registered political committees.

*RELEVANT INDIVIDUALS AND ENTITIES*

8.    LEV PARNAS, the defendant, is a businessman and United States citizen who was born in Ukraine.

9.    IGOR FRUMAN, the defendant, is a businessman and United States citizen who was born in Belarus.

10.    DAVID CORREIA, the defendant, is a businessman and United States citizen who was born in the United States.

11.    ANDREY KUKUSHKIN, the defendant, is a businessman and United States citizen who was born in Ukraine.

12. ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, is a foreign national Russian citizen and businessman who, at all relevant times, was not a citizen or lawful permanent resident of the United States.

*THE STRAW DONOR SCHEME*

13. Beginning in or about March 2018, LEV PARNAS and IGOR FRUMAN, the defendants, began attending political fundraising events in connection with federal elections and making substantial contributions to candidates, joint fundraising committees, and independent expenditure committees with the purpose of enhancing their influence in political circles and gaining access to politicians. PARNAS, who had previously only made one political contribution, and FRUMAN, who had never made a political contribution before 2018, sought to advance their personal financial interests and promote an energy import-export business, Global Energy Producers ("GEP"), that they were in the process of launching. At that time, GEP did not have any income or assets, and did not even have a bank account. In order to falsely make it appear that a large contribution came from GEP and thereby enhance its reputation under false pretenses, PARNAS and FRUMAN routed money through multiple accounts and then intentionally caused contributions to be reported in the name of GEP instead of in FRUMAN's name, even though FRUMAN funded the contributions with

6

his personal funds.   They did so in order to bolster GEP's reputation, make it appear that GEP was an established and successful business capable of making substantial political contributions, and thereby gain support for their business venture.

14.   Specifically, in or about May 2018, to obtain access to exclusive political events and gain influence with politicians, LEV PARNAS and IGOR FRUMAN, the defendants, made a $325,000 contribution to an independent expenditure committee ("Committee-1") and a $15,000 contribution to a second independent expenditure committee ("Committee-2").   Despite the fact that the FEC forms for these contributions required PARNAS and FRUMAN to disclose the true donor of the funds, they falsely reported that the contributions came from GEP, a purported liquefied natural gas ("LNG") import-export business that FRUMAN and PARNAS incorporated around the time the contributions were made.

15.   In truth and in fact, the donations to Committee-1 and Committee-2 did not come from GEP's funds.   Rather, the funds came from a private lending transaction between FRUMAN and third parties, were routed through an account in the name of a shell corporation controlled by PARNAS, and never passed through a GEP account.   Indeed, PARNAS and FRUMAN incorporated GEP at and around the time of the contributions to Committee-1 and Committee-2, and

7

deliberately made the contributions in GEP's name, in order to make it appear that GEP was a successful business capable of making such a contribution when, instead, the true source of the funds was a mortgage FRUMAN took out on an apartment he owned. At that time, GEP had not engaged in LNG business, and had no income or assets.

16. In addition to the contributions made and falsely reported in the name of GEP, LEV PARNAS and IGOR FRUMAN, the defendants, caused illegal contributions to be made in PARNAS's name that, in fact, were funded by FRUMAN, in order to evade federal contribution limits and make it appear that PARNAS was himself a contributor. Much as with the contributions described above, these contributions were made for the purpose of gaining influence with politicians so as to advance the defendants' own personal financial interests. For example, in or about May and June 2018, PARNAS and FRUMAN committed to raise $20,000 or more for a then-sitting U.S. Congressman ("Congressman-1"). In an effort to reach their contribution commitment to Congressman-1 and further their political goals, in or about June 2018, after FRUMAN had already made a maximum $2,700 contribution to Congressman-1, FRUMAN paid for another maximum $2,700 contribution to Congressman-1 that was made and reported in PARNAS's name.

8

17.   Similarly, in or about June 2018, to fulfill a financial commitment required to gain access to an exclusive political event, LEV PARNAS and IGOR FRUMAN, the defendants, made an $11,000 contribution in PARNAS's name to a joint fundraising committee ("Committee-3") that was actually funded by FRUMAN.   As a result of that contribution and a prior contribution FRUMAN had made to Committee-3 in his own name, FRUMAN made contributions in excess of legal contribution limits.

18.   Moreover, and to further conceal the true source of the funds used to make certain of the contributions described above, in or about October 2018, LEV PARNAS, IGOR FRUMAN, and DAVID CORREIA, the defendants, submitted materially false sworn affidavits to the FEC.   In preparing those affidavits, CORREIA asked the defendants' accountant to draft documents describing the transaction that led to the contribution to Committee-1 in a manner that was consistent with the false statements the defendants were making to the FEC, but inconsistent with how they had actually recorded the transaction on GEP's books.   Specifically, and in response to a complaint filed with the FEC regarding the $325,000 contribution to Committee-1, PARNAS, FRUMAN, and CORREIA made the following false statements, in substance and in part:

a.   That "a $325,000 contribution to [Committee-1] . . . was made with GEP funds for GEP purposes," when in truth

9

and in fact, the contribution was made with funds from a private lending transaction by FRUMAN.

> b.   That "GEP is a real business enterprise funded with substantial bona fide capital investment; its major purpose is energy trading, not political activity," when in truth and in fact, GEP had no existing business, was not funded with bona fide capital investment, and was not engaged in energy trading.

19.   Additionally, the affidavits of LEV PARNAS and IGOR FRUMAN, the defendants, falsely stated that the $2,700 contribution made to Congressman-1 in PARNAS's name "was made with a business credit card . . . which [PARNAS] reimbursed," when in truth and in fact, PARNAS did not reimburse FRUMAN or any other individual for that contribution.

*THE FOREIGN NATIONAL DONOR SCHEME*

20.   From in or about June 2018 through in or about April 2019, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendants, and others known and unknown, conspired to have a foreign national -- MURAVIEV -- fund political donations to federal and state public officials and candidates for elected office to gain influence with those officials and candidates as to policies and licensing decisions that would benefit a future business venture.   To conceal the true source of the contributions and donations funded

10

by MURAVIEV, PARNAS, FRUMAN, CORREIA, and KUKUSHKIN caused the
contributions and donations to be made in FRUMAN's and PARNAS's
names rather than in the name of MURAVIEV.

21.   Beginning in or about July 2018, LEV PARNAS, IGOR
FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV,
a/k/a "Andrey Muravyov," the defendants, made plans to form a
cannabis business (the "Business Venture").   The defendants
intended for MURAVIEV to fund the Business Venture and their
initial objective was to obtain the requisite licenses to operate
in particular states, including Nevada.   In or about September
2018, PARNAS, FRUMAN, CORREIA, KUKUSHKIN, and MURAVIEV traveled to
Las Vegas, Nevada, and PARNAS, FRUMAN, and KUKUSHKIN attended a
political fundraiser for a state candidate in Nevada ("Candidate-
1") and pledged to contribute money to Candidate-1.   While in
Nevada, PARNAS, FRUMAN, CORREIA, KUKUSHKIN, and MURAVIEV discussed
the terms of the Business Venture and, as MURAVIEV later wrote in
a text message, "agreed on princip[les] of [their] . . . future
enterprise," which included that MURAVIEV would "provide $1
million for our future enterprise" to be spent in Nevada,
California, New York, and New Jersey to "obtain[] licenses [in]
th[o]se states."

22.   After their meeting in Nevada, LEV PARNAS, IGOR
FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV,

11

a/k/a "Andrey Muravyov," the defendants, agreed upon the terms of the Business Venture, including that MURAVIEV would transfer funds to pay for political contributions.  In or about September and October 2018, CORREIA drafted a table of political donations and contributions for a "multi-state licensing strategy" (the "Political Donations Table").  The Political Donations Table -- which CORREIA drafted with the assistance of PARNAS and FRUMAN, and which FRUMAN sent to KUKUSHKIN and MURAVIEV -- contemplated approximately between $1 and $2 million in political contributions to federal and State political committees, and included a "funding" schedule of two $500,000 transfers by MURAVIEV.  After sending the Political Donations Table to KUKUSHKIN and MURAVIEV, FRUMAN, PARNAS, and CORREIA repeatedly solicited MURAVIEV, sometimes through KUKUSHKIN, to wire money to fund the contributions.  For instance, FRUMAN texted KUKUSHKIN that they "urgently" needed the money from MURAVIEV because they needed to "fork over a check for 250" to Candidate-1.

23.  In accordance with the Political Donations Table, in or about September and October 2018, ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, wired $1 million from foreign bank accounts to a business bank account in the United States designated by IGOR FRUMAN, the defendant.  MURAVIEV, FRUMAN, LEV PARNAS, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants,

intended these funds to be used for making political contributions. Indeed, KUKUSHKIN texted FRUMAN, PARNAS, and MURAVIEV that the "[m]oney transferred by [MURAVIEV] . . . was to support the very specific people and states (per [the Political Donations Table]) in order to obtain green light for licensing." Similarly, KUKUSHKIN texted an individual working for FRUMAN, PARNAS, and CORREIA, "the money was transferred ~ $1M to Lev & Igor's company . . . to cover all the contributions as planned." To conceal the source of the funds and their intended use, the transfers came from bank accounts in the names of foreign limited liability corporations, and were made pursuant to purported loan agreements between those entities and a business operated by FRUMAN and his family member. The agreements were not signed by MURAVIEV or any of the other defendants, and the funds were wired into FRUMAN's business bank account rather than a bank account for the Business Venture in order to, as FRUMAN texted KUKUSHKIN, "avoid problems later."

24.  LEV PARNAS and IGOR FRUMAN, the defendants, used the funds transferred by ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, in part, to make political donations and pay off credit card bills containing charges for political contributions they had previously made that were listed on the Political Donations Table.  For example, on or about October 20, 2018,

PARNAS, FRUMAN, and ANDREY KUKUSHKIN, the defendant, attended a campaign rally for Candidate-1 in Nevada, at which a different Nevada state candidate was present ("Candidate-2"), and sent photographs of themselves posing with Candidate-2 to MURAVIEV. Following that event, on or about November 1, 2018, a donation in the amount of $10,000 was made to Candidate-2 in FRUMAN's name, but it was funded with funds from MURAVIEV.  On or about November 1, 2018, a donation in the amount of $10,000 was also made to Candidate-1 in FRUMAN's name, but it was funded with funds from MURAVIEV.  The defendants intended that it would be FRUMAN and PARNAS who made the contributions in their names. KUKUSHKIN, for example, texted PARNAS, FRUMAN, and MURAVIEV that "the money [was] wired . . . in order to cover all the donations" and that FRUMAN and PARNAS "are the ones issuing them the checks NOT me or [MURAVIEV]."

25.  On or about November 7, 2018, the day after the elections, and following victories of candidates that the defendants supported in certain states, including Florida, ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, congratulated IGOR FRUMAN, LEV PARNAS, and ANDREY KUKUSHKIN, the defendants, "on victory," and KUKUSHKIN added his congratulations for the "victory in Florida" and asked "[w]hen can we get a license and look for the stores."  Nonetheless, notwithstanding the contributions that

14

were made in Florida, Nevada, and elsewhere, the defendants failed to timely apply for cannabis licenses, or were otherwise unsuccessful in obtaining licenses. Ultimately, although MURAVIEV, PARNAS, FRUMAN, and DAVID CORREIA, the defendant, continued to meet into the spring of 2019, the Business Venture did not come to fruition.

### The Fraud Guarantee Scheme

26. Between in or about late 2012 and in or about mid-2019, LEV PARNAS and DAVID CORREIA, the defendants, conspired to defraud multiple victims by inducing them to invest in their company, known as "Fraud Guarantee," based on materially false and misleading representations. In particular, to induce victims to invest, PARNAS and CORREIA represented, falsely, that investors' funds would be used solely for legitimate business expenses of Fraud Guarantee, when in fact the funds were largely withdrawn as cash, transferred to personal accounts, and used for various apparently personal expenditures. PARNAS and CORREIA also made materially false representations concerning, among other things, how much money PARNAS had contributed to the company and how much money the company had raised overall. At least seven victims invested in Fraud Guarantee based at least in part on PARNAS's and CORREIA's false and misleading representations, with each victim

being fraudulently induced to pay hundreds of thousands of dollars, for a total of more than $2 million.

27. LEV PARNAS and DAVID CORREIA, the defendants, established Fraud Guarantee in or about late 2012.  PARNAS and CORREIA pitched Fraud Guarantee to potential investors as a company that would provide services to protect investors from fraud.  In particular, PARNAS and CORREIA claimed that Fraud Guarantee would offer an insurance product that would allow policyholders to recoup their losses in the event they lost money due to fraudulent conduct.  Thus, for example, if an investor invested in "Company XYZ" and purchased a Fraud Guarantee policy, then in the event that the investor lost the value of the investment due to a criminal fraud at Company XYZ, Fraud Guarantee would enable the investor to recoup the investor's losses.  Although PARNAS and CORREIA undertook certain efforts to launch Fraud Guarantee and bring its products to market, the company never became operational.

28. In or about late 2012 to early 2013, LEV PARNAS and DAVID CORREIA, the defendants, induced three victims ("Victim-1," "Victim-2," and "Victim-3") to invest in Fraud Guarantee through false and fraudulent representations.  PARNAS and CORREIA told these victims, in substance and in part, that Fraud Guarantee was a start-up company and that they were raising funds to develop products and otherwise facilitate the company's development.

16

PARNAS and CORREIA further stated, in substance and in part, that they were not taking salaries and that all investor funds would be used for appropriate business expenses of Fraud Guarantee.

29. Based at least in part on the above-referenced representations, between in or about January 2013 and in or about January 2014, Victim-1, Victim-2, and Victim-3 invested a total of approximately $750,000 in Fraud Guarantee, through payments to an account in which both LEV PARNAS and DAVID CORREIA, the defendants, were signatories ("FG Account-1"). While a portion of these funds was spent on Fraud Guarantee business expenses, the majority was not. During this time period, from FG Account-1, more than $230,000 was withdrawn as cash, more than $130,000 was used to pay rent for PARNAS's personal residence, more than $40,000 was transferred to accounts in the name of PARNAS and his wife, and at least tens of thousands of dollars were spent on various apparently personal expenditures, including more than $30,000 at luxury car leasing companies.

30. Based at least in part on further representations by LEV PARNAS and DAVID CORREIA, the defendants, that additional funds were needed for legitimate business expenses of Fraud Guarantee, between in or about March 2014 and June 2014, Victim-1 and Victim-2 paid a total of approximately $190,000 to an account in the name of PARNAS and his wife ("Parnas Account-1"). While a portion of

these funds was spent on Fraud Guarantee business expenses, the majority was not. During this time period, from Parnas Account-1, more than $100,000 was used to pay rent for PARNAS's personal residence, more than $29,000 was withdrawn as cash, approximately $3,000 in net transfers were made to a savings account in the name of PARNAS and his wife, approximately $4,000 was transferred to an account in the name of CORREIA's wife, and thousands of dollars were spent on various apparently personal expenditures.

31. Based at least in part on further representations by LEV PARNAS and DAVID CORREIA, the defendants, that additional funds were needed for legitimate business expenses of Fraud Guarantee, in or about July 2014, Victim-3 paid a total of approximately $15,000 to an account in the name of Fraud Guarantee, in which PARNAS and CORREIA were both signatories ("FG Account-2"). During this time period, from FG Account-2, more than $8,000 in net cash withdrawals were made, more than $3,000 was transferred to an account in the name of CORREIA's wife, and at least hundreds of dollars were spent on various apparently personal expenditures.

32. In or about late 2015, LEV PARNAS and DAVID CORREIA, the defendants, induced another victim ("Victim-4") to invest in Fraud Guarantee through false and fraudulent representations. PARNAS and CORREIA told Victim-4, in substance and in part, that PARNAS had personally invested millions of dollars in Fraud

Guarantee, which was false.   PARNAS and CORREIA also provided Victim-4 with a Fraud Guarantee "business plan," which contained various false and misleading claims about the company, including suggesting that the funds raised to that point had been used on legitimate business expenses, when, in fact, those funds had largely been withdrawn as cash, transferred to personal accounts, and used on various apparently personal expenditures, as described above.   PARNAS and CORREIA told Victim-4, in substance and in part, that the funds he invested would be used solely for legitimate business expenses of Fraud Guarantee and, consistent with that claim, they provided him with a convertible loan agreement, which represented that Victim-4's funds would be used "to finance the development, promotion, and initial operation of an investment protection business" and would be "fully reserved and committed" for such purposes.

33. Based at least in part on the above-referenced representations, between in or about December 2015 and in or about mid-2016, Victim-4 invested a total of approximately $300,000 in Fraud Guarantee, through payments to an account in which LEV PARNAS, the defendant, was sole signatory ("Parnas Account-2"). Victim-4 wired his funds to Parnas Account-2 because PARNAS and DAVID CORREIA, the defendant, led Victim-4 to believe, falsely, that PARNAS had already contributed approximately $300,000 to

19

Fraud Guarantee on Victim-4's behalf, and that Victim-4 therefore needed to reimburse PARNAS.  In fact, PARNAS had never contributed any funds to Fraud Guarantee on Victim-4's behalf.  Nor did PARNAS contribute the $300,000 to Fraud Guarantee once Victim-4 transferred those funds to Parnas Account-2.  Rather, while a portion of the funds Victim-4 transferred to Parnas Account-2 was used for Fraud Guarantee business expenses, PARNAS mainly used the funds for personal purposes.  In particular, during this period, from Parnas Account-2, more than $76,000 was withdrawn as cash, approximately $14,000 in net transfers were made to accounts in the name of PARNAS and/or PARNAS's wife and son (of which approximately $2,000 was transferred to an account in the name of CORREIA's wife), approximately $5,500 was transferred to an account in the name of CORREIA's wife, and thousands of dollars were spent on various apparently personal expenditures, including more than $30,000 at luxury car leasing companies.

34. In or about early 2016, LEV PARNAS and DAVID CORREIA, the defendants, induced another victim ("Victim-5") to invest in Fraud Guarantee through false and fraudulent representations. PARNAS and CORREIA told Victim-5, in substance and in part, that PARNAS had contributed a significant amount of money to the company, and PARNAS and CORREIA provided Victim-5 with Fraud Guarantee documents, which indicated, in one document, that

PARNAS's "capital account" was $570,000, and in another document that PARNAS's "capital account" was $1.1 million and CORREIA's "capital account" was $143,000.   These explicit and implicit representations as to the amount of funding provided by PARNAS and CORREIA were false.   PARNAS and CORREIA also provided Victim-5 with the false and misleading "business plan" that they had provided to Victim-4.   Based at least in part on these misrepresentations, Victim-5 invested approximately $250,000 in Fraud Guarantee, consisting of approximately $200,000 in payments to PARNAS plus a vehicle valued at approximately $50,000, which Victim-5 transferred to PARNAS.

35. In or about late 2016, LEV PARNAS and DAVID CORREIA, the defendants, induced another victim ("Victim-6") to invest in Fraud Guarantee through false and fraudulent representations. PARNAS and CORREIA told Victim-6, in substance and in part, that they were not taking salaries and that Victim-6's funds would be used for appropriate business expenses of Fraud Guarantee.   PARNAS further told Victim-6, in substance and in part, that PARNAS had invested millions of dollars of his own money in Fraud Guarantee, which was false.   CORREIA also told Victim-6, via email, that "[t]here was 'significant' investment from all parties in order to take ownership [in Fraud Guarantee].   Is equated to several millions of dollars invested."   This was false, as Fraud Guarantee

had raised substantially less than "several millions of dollars" and the funds had, moreover, been largely withdrawn as cash, transferred to personal accounts, and spent on apparently personal expenditures, as described above. PARNAS and CORREIA also sent Victim-6 the false and misleading "business plan" that they had provided to Victim-4 and Victim-5.

36. Based at least in part on the above-referenced representations, on or about October 14, 2016, Victim-6 invested approximately $300,000 in Fraud Guarantee through a payment to Parnas Account-2. Thereafter, from Parnas Account-2, approximately $169,000 was transferred to an account in the name of PARNAS and his wife, approximately $14,000 was withdrawn as cash, and thousands of dollars were spent on various apparently personal expenditures. Of the approximately $169,000 transferred to an account in the name of PARNAS and his wife, approximately $50,000 was used to fund a political contribution and approximately $25,000 was transferred to an account in the name of CORREIA's wife and was used, in part, to fund a political contribution.

37. In or about mid-to-late 2018, LEV PARNAS and DAVID CORREIA, the defendants, induced another victim ("Victim-7") to invest in Fraud Guarantee through false and fraudulent representations. PARNAS and CORREIA told Victim-7, in substance and in part, that Fraud Guarantee had raised millions of dollars

from multiple investors.  For example, during a phone call between Victim-7 and CORREIA on or about September 18, 2018 -- which Victim-7 recorded without CORREIA's knowledge -- Victim-7 pressed CORREIA to tell him "how much money . . . has been invested in this company so far overall," and CORREIA replied, in substance and in part, "Millions, man.  I don't misspeak.  $4 or $5 million probably."  These representations were false, as the company had raised far less than "millions," and the funds that had been raised had been largely withdrawn as cash, transferred to personal accounts, and used on various apparently personal expenditures, as described above.  During this call and on other occasions, PARNAS and CORREIA also misrepresented to Victim-7, among other things, the extent to which PARNAS had invested his own funds in Fraud Guarantee and the extent to which PARNAS and other existing investors would be investing additional funds alongside Victim-7.

38. Based at least in part on the above-referenced representations, in or about September and October 2018, Victim-7 invested a total of approximately $500,000 in Fraud Guarantee by transmitting the funds to an account held by a consulting firm that LEV PARNAS and DAVID CORREIA, the defendants, had retained on Fraud Guarantee's behalf.

COUNT ONE
(Conspiracy: The Straw Donor Scheme)

The Grand Jury charges:

39.  The  Grand  Jury  incorporates  the  allegations
contained in paragraphs 1 through 19 of this Superseding Indictment
as though fully set forth herein.

40.  From in or about March 2018 through at least in or
about November 2018, in the Southern District of New York and
elsewhere, LEV PARNAS and IGOR FRUMAN, the defendants, knowingly
conspired with each other and with others known and unknown to:

a. Knowingly  defraud  the  United  States  by
impairing, obstructing, and defeating the lawful functions of a
department or agency of the United States; to wit, the FEC's
function to administer federal law concerning source and amount
restrictions  in  federal  elections,  including  the  prohibitions
applicable to straw donors.

b. Knowingly and willfully make contributions to
candidates for federal office, joint fundraising committees, and
independent expenditure committees in the names of other persons,
aggregating to $25,000 and more in a calendar year, in violation
of Title 52, United States Code, Section 30122 and 30109(d)(1)(A)
& (D).

41.  In furtherance of the conspiracy and to effect the
illegal  objects  thereof,  LEV  PARNAS  and  IGOR  FRUMAN,  the

24

defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about March 2018, PARNAS committed to making a $125,000 contribution to Committee-3 to attend a fundraising event in the Southern District of New York.

b. In or about May 2018, FRUMAN, and others known and unknown, obtained a private loan, the proceeds of which were used to fund the contribution made in the name of GEP to Committee-1.

c. In or about May 2018, FRUMAN and PARNAS, and others known and unknown, transferred the proceeds of FRUMAN's private loan through multiple bank accounts – none of which were in the name of GEP - to conceal the true source of the funds before they were paid to Committee-1.

d. In or about May 2018, PARNAS caused a $325,000 contribution to Committee-1 to be falsely reported in the name of GEP.

e. In or about June 2018, PARNAS made an $11,000 contribution to Committee-3 using funds that belonged to FRUMAN and another individual.

f. In or about June 2018, PARNAS used a business credit card registered to a credit card account, with a registered

address in the Southern District of New York, belonging to FRUMAN

and another individual in order to make a maximum $2,700

contribution to Congressman-1's reelection campaign.

(Title 18, United States Code, Section 371, and Title 52, United
States Code, Sections 30122 and 30109(d)(1)(A) & (D))

### COUNT TWO
(False Statements to the FEC)

The Grand Jury further charges:

42. The Grand Jury incorporates the allegations

contained in paragraphs 1 through 19 of this Superseding Indictment

as though fully set forth herein.

43. In or about October 2018, in the Southern District

of New York and elsewhere, LEV PARNAS, IGOR FRUMAN, and DAVID

CORREIA, the defendants, willfully and knowingly did make

materially false, fictitious, and fraudulent statements and

representations in a matter within the jurisdiction of the

executive branch of the Government of the United States, to wit,

PARNAS, FRUMAN, and CORREIA made the materially false statements

in their affidavits submitted to the FEC, described in paragraph

18 above, that "a $325,000 contribution to [Committee-1] . . . was

made with GEP funds for GEP purposes," and that "GEP is a real

business enterprise funded with substantial bona fide capital

investment; its major purpose is energy trading, not political

activity"; and PARNAS and FRUMAN made the materially false

26

statement in their affidavits submitted to the FEC, described in paragraph 19 above, that a contribution made by PARNAS on or about June 25, 2018 to Congressman-1's campaign for reelection "was made with a business credit card . . . which [PARNAS] reimbursed."

(Title 18, United States Code, Sections 1001(a)(2) and 2)

## COUNT THREE
(Falsification of Records)

The Grand Jury further charges:

44. The Grand Jury incorporates the allegations contained in paragraphs 1 through 19 of this Superseding Indictment as though fully set forth herein.

45. In or about October 2018, in the Southern District of New York and elsewhere, LEV PARNAS, IGOR FRUMAN, and DAVID CORREIA, the defendants, willfully and knowingly did falsify and make a false entry in a record and document with the intent to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of any department or agency of the United States, and in relation to and in contemplation of any such matter, to wit, PARNAS, FRUMAN, and CORREIA made the materially false statements in affidavits submitted to the FEC, described in paragraph 18 above, including that "a $325,000 contribution to [Committee-1] . . . was made with GEP funds for GEP purposes," and that "GEP is a real business enterprise funded with substantial bona fide capital investment;

27

its major purpose is energy trading, not political activity"; and PARNAS and FRUMAN made the materially false statement in their affidavits submitted to the FEC, described in paragraph 19 above, that a contribution made by PARNAS on or about June 25, 2018 to Congressman-1's campaign for reelection "was made with a business credit card . . . which [PARNAS] reimbursed," with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the FEC.

(Title 18, United States Code, Sections 1519 and 2)

### COUNT FOUR
(Conspiracy: The Foreign National Donor Scheme)

The Grand Jury further charges:

46. The Grand Jury incorporates the allegations contained in paragraphs 1 through 12 and 20 through 25 of this Superseding Indictment as though fully set forth herein.

47. From in or about June 2018 through at least in or about April 2019, in the Southern District of New York and elsewhere, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendants, and others known and unknown, knowingly conspired with each other and with others known and unknown to:

a. Knowingly defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States; to wit, the FEC's

28

function to administer federal law concerning source and amount restrictions in federal and State elections, including the prohibitions applicable to foreign nationals and straw donors.

b. Knowingly and willfully make contributions and donations of money, or express or implied promises to make contributions or donations, directly and indirectly, by a foreign national in connection with federal and State elections, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121 and 30109(d)(1)(A).

c. Knowingly and willfully make contributions to candidates for State and federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Section 30122 and 30109(d)(1)(A) & (D).

48. In furtherance of the conspiracy and to effect its illegal object, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, ANDREY KUKUSHKIN, and ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about September 18, 2018, ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, wired $500,000

29

from a foreign bank account, through the Southern District of New York, to a bank account under the control of IGOR FRUMAN, the defendant, for purposes of making political contributions and donations.

b.   On or about October 16, 2018, ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, wired $500,000 from a foreign bank account, through the Southern District of New York, to a bank account under the control of IGOR FRUMAN, the defendant, for purposes of making political contributions and donations.

c.   On or about November 1, 2018, LEV PARNAS and IGOR FRUMAN, the defendants, used funds wired by ANDREY MURAVIEV, a/k/a "Andrey Muravyov," the defendant, to make maximum donations to two political candidates for State office in Nevada.

(Title 18, United States Code, Section 371, and Title 52, United States Code, Sections 30121, 30122 and 30109(d)(1)(A) & (D))

## COUNT FIVE
(Solicitation of a Contribution by a Foreign National)

The Grand Jury further charges:

49.   The Grand Jury incorporates the allegations contained in paragraphs 1 through 12 and 20 through 25 of this Superseding Indictment as though fully set forth herein.

50.   From in or about June 2018 through at least in or about April 2019, in the Southern District of New York and elsewhere, LEV PARNAS, IGOR FRUMAN, and DAVID CORREIA, the

30

defendants, knowingly and willfully solicited, and aided and abetted the solicitation of, a foreign national, directly and indirectly, to make contributions and donations of money, and made express and implied promises to make contributions and donations, in connection with federal and State elections, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and Title 18, United States Code, Section 2)

COUNT SIX
(Making a Contribution by a Foreign National)

The Grand Jury further charges:

51. The Grand Jury incorporates the allegations contained in paragraphs 1 through 12 and 20 through 25 of this Superseding Indictment as though fully set forth herein.

52. From in or about June 2018 through at least in or about April 2019, in the Southern District of New York and elsewhere, ANDREY MURAVIEV, a/k/a "Andrey Muravyov," LEV PARNAS, IGOR FRUMAN, and ANDREY KUKUSHKIN, the defendants, knowingly and willfully made and aided and abetted the making of contributions and donations of money, and the making of express and implied promises to make contributions and donations, directly and

indirectly, by a foreign national in connection with federal and State elections, aggregating $25,000 and more in a calendar year.

(Title 52, United States Code, Sections 30121 and 30109(d)(1)(A), and Title 18, United States Code, Section 2)

COUNT SEVEN
(Conspiracy: The Fraud Guarantee Scheme)

The Grand Jury further charges:

53.    The Grand Jury incorporates the allegations contained in paragraphs 26 through 38 of this Superseding Indictment as though fully set forth herein.

54.    Between in or about late 2012 and in or about mid-2019, in the Southern District of New York and elsewhere, LEV PARNAS and DAVID CORREIA, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

55.    It was a part and object of the conspiracy that LEV PARNAS and DAVID CORREIA, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice to defraud and attempting so to do, would and did transmit and cause to be transmitted by means of wire, radio,

and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343, to wit, PARNAS and CORREIA conspired to defraud multiple victims by inducing them to invest in a company known as "Fraud Guarantee" based on materially false and misleading representations regarding, among other things, how the victims' funds would be used, how much money PARNAS had contributed to the company, and how much money the company had raised overall.

(Title 18, United States Code, Section 1349.)

### FORFEITURE ALLEGATIONS

56. As the result of committing the offense alleged in Count Seven of this Superseding Indictment, LEV PARNAS and DAVID CORREIA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

SUBSTITUTE ASSETS PROVISION

57.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
AUDREY STRAUSS
Acting United States Attorney

34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LEV PARNAS,
IGOR FRUMAN,
DAVID CORREIA,
ANDREY KUKUSHKIN,
ANDREY MURAVIEV,
a/k/a "Andrey Muravyov,"

Defendants.

SEALED SUPERSEDING INDICTMENT

S2 19 Cr. 725 (JPO)

Title 18, United States Code,
Sections 371, 1001(a)(2), 1349,
1519, and 2 and Title 52, United
States Code, Sections 30121, 30122
and 30109(d)(1)(A) & (D)).

AUDREY STRAUSS
Acting United States Attorney

A TRUE BILL

_____
                           Foreperson.

09/17/20
(CA)   SEALED SUPERSEDING INDICTMENT FILED
       KH PAPER
       USDJ